No. 92-322

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

      Plaintiff and Respondent,

  -vs-

WELCH BROGAN,

      Defendant and Appellant.

APPEAL FROM:  District Court of the Sixth Judicial District,
In and for the County of Park,
The Honorable Pete L. Rapkoch, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Richard L. Kalar, Attorney at Law, Boulder,
Colorado

          Joe Gary, Attorney at Law, Bozeman, Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General, John
Paulson, Ass't Attorney General, Helena, Montana

          Tara DePuy, Deputy Park County Attorney, Livingston
Montana

**FILED**

Filed:  OCT 15 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  August 19, 1993

Decided:  October 15, 1993

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Welch Brogan (Brogan) appeals his convictions for failing to maintain fences on his game farm and illegally capturing wild elk for use in his game farm business, following a bench trial in the District Court of the Sixth Judicial District, Park County. We affirm.

Brogan raises eight issues and numerous sub-issues on appeal, which we consolidate and rephrase as follows:

1.  Did the District Court err by denying Brogan's motion to dismiss on the grounds that the complaints failed to adequately set forth violations of Montana law?

2.  Is there sufficient evidence in the record to support Brogan's convictions?

Brogan, 85, has owned and operated an elk game farm in Corwin Springs, Montana, since 1946. Known by some as the "granddaddy of all elk farmers," Brogan buys and sells elk in the local, national and international markets. At times, he has had up to 250 head of elk in his inventory.

From 1946 until 1983, Brogan operated an elk farm on the west side of Highway 89, approximately ten miles north of Yellowstone National Park. In 1983, he relocated the farm next to his home on the east side of the highway. The Montana Department of Fish, Wildlife and Parks (Department) approved an expansion of Brogan's elk farm and his use of electric fence to contain his elk and prohibit access of wild game.

The elk farm is comprised of approximately 400 acres, most of

2

which is rugged, mountainous terrain. Behind Brogan's house to the northeast is a rectangular pen, which generally houses bull elk (bull pen). To the north of his house, adjacent to the bull pen and joined by a corral, is a triangular pen. To the northwest, adjacent to the triangular pen, is a cow pasture, which generally houses cow elk (cow pen). North of the triangular pen and cow pen is a large mountain pasture (upper mountain pasture), and east/northeast of the upper mountain pasture is Forest Service land. At the northernmost point of the triangular pen, a series of non-electric gates connects the triangular pen, the cow pen, the upper mountain pasture and Forest Service land.

Electric fence separately encloses the upper mountain pasture, the triangular pen, the cow pen and the bull pen. The electric fence, which emits 5,000 to 6,000 volts of electricity, has transponders which remit signals to a shed near Brogan's home if the fence malfunctions. The fence is broken down into sections, which Brogan can monitor from his home and control from a panel in the shed. The panel allows Brogan to identify which, if any, section of fence is malfunctioning.

Brogan has enjoyed a good relationship with the Department. In 1946, the Department approved Brogan's elk farm. In 1984, the Department approved Brogan's expanded elk farm and electric fencing. Over the years, various Montana game wardens have inspected Brogan's elk farm, counted his elk, checked for disease, reviewed his record books, and helped him trap and remove wild deer from his elk farm.

On December 5, 1988, Game Wardens Randy Weurtz, Jim Kropp and Hank Fabich inspected Brogan's elk farm. During this routine inspection, they counted 90 elk: forty-five cows and calves in the cow pen and forty-five de-antlered bulls in the bull pen (bulls are de-antlered so as not to injure their handlers or one another). On December 5th, the wardens' count matched Brogan's records.

On February 6, 1989, while patrolling the late season elk hunt near Gardiner, Montana, Weurtz was checking hunters on Cinnabar Mountain. From that vantage point, he noticed unusual movement across the river on Brogan's elk farm. Though his view of the lower triangular pen was partially obscured, Weurtz observed about forty elk--cows, calves and antlered bulls--running back and forth in Brogan's triangular pen. The elk in that pen were apparently wild, spooked and entrapped by a closed gate. According to Weurtz, Brogan's cow elk in the cow pen and de-antlered bull elk in the bull pen remained calm, yet watched the wild elk with curiosity.

Based on his suspicion that Brogan was harboring wild elk, Weurtz contacted his supervisor, Warden Bud Hubbard. Hubbard suggested a reconnaissance flight over Brogan's elk farm. On an early morning flight of February 7, 1989, Weurtz observed elk in the upper mountain pasture, animal tracks through that gate preserved in snow-covered ground, and hay just inside the gate.

Weurtz, Hubbard and Kropp visited Brogan early that afternoon. Fabich and fellow warden, Terry Hill, watched from the Ranch Kitchen, a Corwin Springs restaurant from which they could partially observe the elk farm. Hubbard informed Brogan that they

4

wished to inspect his elk. Brogan asked if the wardens would mind returning in an hour and a half, when one of Brogan's hired hands would be available to assist with the count. Hubbard agreed.

The wardens drove across Highway 89 to Cinnabar Mountain to observe the elk in Brogan's pens. The weather was clear. They observed calm cow elk in the cow pen, calm bull elk in the bull pen, and mixed wild elk--cows, calves and antlered bulls--running in the triangular pen. All gates were closed. Minutes later, the wardens saw Brogan and an assistant drive to the series of gates and open the gate connecting the triangular pen to Forest Service land. Brogan and his assistant then drove to the bottom of the triangular pen and herded the wild elk up through the open gate. The wardens counted at least 80 head of wild elk being forced from the triangular pen. Scurrying to escape, one cow elk attempted to jump the fence leading to the upper mountain pasture. She became entangled in that fence, eventually freed herself and, injured, limped off into the upper mountain pasture.

The wardens immediately drove to Brogan's ranch. They met Brogan and his assistant, Blake Romey, who were walking down from the triangular pen. Hubbard asked Brogan what had just taken place. Brogan replied that he was attempting to remove some wild deer from his elk farm. Hubbard challenged that claim, explaining that the wardens had just watched him run wild elk from his farm onto Forest Service land. Brogan then stated that he was trying to recapture one of his bull elk, which he may have lost back in January. Brogan had not reported the lost bull, as required by

5

State law.

Hubbard told Brogan that he had violated Montana law. The wardens then secured further evidence. They photographed the elk tracks and noted that hay was spread just outside and inside of the triangular pen. They observed a doe deer and a healthy, wild cow elk in the upper mountain pasture; not the injured cow elk they had seen jump the fence.

The wardens saw elk and deer tracks leading to and from Forest Service land and the upper mountain pasture, through the electric fence. When Weurtz's dog, which was along for the ride, ran out and back in through the electric fence unaffected, the wardens concluded that the electric fence was turned off.

The wardens and one of Brogan's assistants then counted Brogan's elk. The cow count matched what was documented in Brogan's records. The bull count yielded one less bull than was documented in Brogan's records.

On May 30, 1989, the Department cited Brogan for three violations of Montana law under § 87-1-201, MCA (1989):

1. Failure to maintain fence on a game farm in such a manner as to prevent entry of wild game animals to the triangular pen in violation of Department regulations.

2. Failure to maintain fence on a game farm in such a manner as to prevent entry of wild game animals to the upper mountain pasture in violation of Department regulations.

3. Unlawfully capturing over 80 wild elk in violation of Department regulations.

Following a bench trial on November 27, 1989, the Park County Justice Court found Brogan guilty on all three counts. Brogan was

6

notified of the verdict on December 12, 1989, and he appealed to the Park County District Court.

On April 12, 1991, Brogan filed a motion to dismiss on the grounds that the complaints failed to adequately set forth violations of law. The District Court denied the motion and a bench trial was held on April 15, 1991, and May 1, 1991. After receiving post-trial briefs from the parties, the District Court entered its findings of fact and conclusions of law on September 6, 1991. The District Court fined Brogan $500 on each of the three counts. Brogan appeals.

I

Did the District Court err by denying Brogan's motion to dismiss on the grounds that the complaints failed to adequately set forth violations of Montana law?

Brogan challenges the sufficiency of the charging documents. He first argues that by charging him under § 87-1-201, MCA (1989), the Department failed to provide him adequate notice of the offenses charged. That statute, he argues, merely sets out the Department's powers and duties.

Brogan received one citation for failure to maintain the upper mountain pasture fence and another for failure to maintain the triangular pen fence. He suggests that he should have been charged for these violations under 12.6.1503 A.R.M. (1989). That rule on game farm fencing requirements provides in pertinent part:

> (3) The fence shall be maintained in a game-proof condition at all times. If cloven-hoofed game are able to pass through, under, or over the fence because of any local topographic or other conditions, the licensee shall

7

supplement the fence so as to prevent such passage.

Brogan received a third citation for unlawful capture of 80 wild elk. He suggests that he should have been charged for this violation under § 87-4-418, MCA (1989). That statute, on unlawful capture, states that "[n]o person may capture, take, or otherwise acquire any game animal in this state for use on a game farm except as provided in 87-4-410." Section 87-4-410, MCA (1989), in turn, sets out specific procedures for the game farm licensee and the Department to follow when capturing and removing wild game from a game farm.

The Department agrees that if Brogan were charged simply with violating § 87-1-201, MCA (1989), then his argument would have merit. That statute provides in pertinent part:

(1) The department shall supervise all the wildlife, fish, game, game and nongame birds, waterfowl, and the game and fur-bearing animals of the state. It possesses all powers necessary to fulfill the duties prescribed by law and to bring actions in the proper courts of this state for the enforcement of the fish and game laws and the rules adopted by the department.

(2) It shall enforce all the laws of the state respecting the protection, preservation, and propagation of fish, game, fur-bearing animals, and game and nongame birds within the state.

Brogan next argues that where conduct alleged in the complaint may be wholly innocent, the unlawfulness of the conduct must be either stated expressly or by using terms or facts which clearly imply the unlawfulness. See People v. Campbell (Ill. App. Ct. 1972), 279 N.E.2d 123, 124. We determine that the complaints expressly stated the unlawfulness of Brogan's conduct, using facts and terms which clearly explained the offenses charged.

8

Brogan further argues that the charging language of the complaints is insufficient because it fails to precisely track the statutes under which he should have been charged. To support his contention, Brogan relies on People v. Hayn (Ill. App. Ct. 1969), 253 N.E.2d 575. In Hayn, the court held that an indictment failing to allege the mental state element of theft was insufficient to charge an offense and was, therefore, fatally defective. Hayn, 253 N.E.2d at 577. However, as the Department correctly asserts, Montana does not test the sufficiency of charging documents by such a rigid rule. Rather, we apply the "common understanding" rule. State v. Board (1959), 135 Mont. 139, 142, 337 P.2d 924, 926; see also § 46-11-401(c)(iii), MCA (1989).

The common understanding rule requires that a court determine whether the charging language allows a person of common understanding to know what is intended to be charged. Board, 337 P.2d at 142 (citing State v. McGowan (1908), 36 Mont. 422, 425-26, 93 P. 552, 554). Moreover, the test of the sufficiency of a charging document is whether the defendant is apprised of the charges and whether he will be surprised. State v. Bogue (1963), 142 Mont. 459, 462, 384 P.2d 749, 750. We have held that if the facts, acts and circumstances of an offense are sufficiently set forth in a complaint, then erroneously naming the offense or an erroneous statutory reference will not invalidate the charge. State v. Collins (1987), 226 Mont. 188, 191, 734 P.2d 686, 688-89 (citations omitted).

In this case, the complaints clearly detailed specific

violations of law. The Department contends and the record shows that the complaints specify the particular facts and date of the violations. Brogan knew full well what offenses he had been charged with. He was prosecuted in Justice Court on the same complaints. Nothing in the record indicates that the Department's proof or theories changed on appeal to the District Court.

Brogan was not surprised by the alleged inadequacies of the complaints. At most, the slight imperfections in the complaints constituted harmless error. See State v. Pearson (1985), 217 Mont. 363, 367, 704 P.2d 1056, 1059. From the record, it is clear that Brogan presented a complete defense to all charges brought against him. We hold that the District Court properly denied Brogan's motion to dismiss and correctly concluded that Brogan had adequate notice of the charges brought against him.

Our decision here is distinguishable from our holding in State v. Later (Mont. 1993), ___ P.2d ___, 50 St.Rep. 1099. A careful review of this record reveals that the instant case fits within the Longneck line of cases, distinguished in the recent Later case. State v. Longneck (1981), 196 Mont. 151, 640 P.2d 436. "The Longneck line of cases concern informations [or complaints] which fully inform the defendant charged 'of what was intended to be charged and against what he was required to defend.'" Later, 50 St.Rep. at 1100.

Brogan was fully informed as to the specific conduct engaged in which formed the basis of the complaint. Additionally, he was informed that his conduct violated Department regulations. Here,

10

the erroneous statutory citation was a minor error which did not prejudice a substantial right of the defendant.

The defendant in Later, on the other hand, was not notified of the specific conduct which formed the basis of the official misconduct violation until after the defense had rested and the jury instructions were being settled. We concluded that an amendment to the complaint at such a late date, to a completely different statute, substantially altered the underlying offense which formed the basis of the official misconduct violation. Such was not the case here, as Brogan was able to present a defense tailored to the specific conduct which formed the basis of the Department's complaint.


II

Is there sufficient evidence in the record to support Brogan's convictions?

Where the sufficiency of the evidence is at issue on appeal in a criminal bench trial, the standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bower (1992), 254 Mont. 1, 6, 833 P.2d 1106, 1110 (citing State v. Riley (1992), 252 Mont. 469, 830 P.2d 549). In addition, the credibility of the witnesses and the weight of the evidence are exclusively within the province of the trier of fact. State v. Whitcher (1991), 248 Mont. 183, 188, 810 P.2d 751, 754.

11

"The [trier of fact] is not bound to blindly accept a defendant's version of the facts." State v. Sorenson (1980), 190 Mont. 155, 170, 619 P.2d 1185, 1194. If events are capable of different interpretations, the trier of fact determines which is most reasonable. State v. Matson (1987), 227 Mont. 36, 39-40, 736 P.2d 971, 973 (citation omitted). Section 26-1-501, MCA, permits the trier of fact to make inferences based on the facts proved.

In the case before us, the District Court, the trier of fact, assessed the credibility of the witnesses and weighed the evidence. The court found the Department's version of the events more credible than Brogan's.

Brogan contends that the evidence relied on by the Department was circumstantial and not inconsistent with the rational theory that he was attempting to recapture an escaped bull elk. See State v. Starr (1983), 204 Mont. 210, 664 P.2d 893. However, the Department presented direct evidence of the charged violations. The game wardens saw wild elk entrapped in the triangular pen on Brogan's elk farm. They testified that they saw Brogan and his assistant open the gate connecting the triangular pen to Forest Service land. The wardens testified that they watched the pair return to the base of the triangular pen and force more than 80 head of wild elk from Brogan's elk farm onto Forest Service land. The wardens further testified that they observed a wild cow elk injure herself when jumping the fence leading to the upper mountain pasture; yet they noted a different, healthy cow elk and doe deer in the upper mountain pasture as well. Their testimony is direct

12

evidence of Brogan's unlawful capture of wild elk and of his failure to maintain game-proof fences surrounding the triangular pen and upper mountain pasture.

The District Court found that deer entered Brogan's upper mountain pasture through the electric fence; that the gate connecting the upper mountain pasture to Forest Service land was open during the week preceding February 7, 1989; and that the fences were not electrified on February 7th. These findings support the District Court's conclusion that Brogan failed to maintain his fences to prevent the entry of wild game animals.

Brogan asserts that it would have been impossible for him to use any of the elk in question, as he can only sell elk which are double-tagged in their ears by a state-licensed veterinarian. He argues that it would have been foolish for him to trap and use wild elk, which present disease and health dangers to his healthy elk.

Brogan argues that the reasons he left gates open and strategically placed the hay were: 1) to lure his escaped bull elk back onto the farm; and 2) to bait wild deer out of his upper mountain pasture. This "bait and pray" tactic, Brogan contends, is standard industry practice for removing wild animals and recapturing escaped elk--a tactic the Department knew about and endorsed. Brogan further argues that the Department helped him remove deer on an ongoing basis.

It is true that the Department at one time provided Brogan with traps to remove wild deer and even assisted Brogan with "bait and pray" tactics in the past. However, as Warden Hubbard

13

testified, the Department must supervise any operation where a gate to the wild is open. Otherwise, the fence is not being maintained in game-proof condition. The Department never gave Brogan permission to conduct an unsupervised "bait and pray" operation.

Brogan argues that § 87-4-419, MCA (1989), directs him to "make every reasonable effort to recapture" his game farm animals. However, Brogan apparently ignored the direction in the same sentence of that statute which provides that "the game farm licensee shall immediately notify the department of [the animal's] escape." Brogan contends that he did not know he was required to contact the Department if his elk escaped. However, he testified that when one of his elk escaped in 1982, while he was working in Alaska, he "called one of the game wardens to tell them we had an elk out."

The record supports the District Court's finding that Brogan failed to notify the Department of his alleged escaped bull until twice confronted by Warden Hubbard about releasing wild elk from his triangular pen. As the Department correctly points out, the District Court was not obligated to accept Brogan's explanations and rationale for his conduct. Rather, the District Court heard testimony, observed the witnesses and gauged their credibility, and concluded that Brogan intended to capture the wild elk for use on his game farm.

Brogan next argues that the Department failed to prove beyond a reasonable doubt that he intended to use the wild elk he captured on his elk farm. See § 87-4-418, MCA (1989). Conversely, the

14

Department argues, and we agree, that it need not prove how Brogan planned to use the elk. The rule in Montana is that circumstantial evidence is an "acceptable and often convincing method of proving criminal intent." State v. Pascgo (1977), 173 Mont. 121, 126, 566 P.2d 802, 805. "The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense." Section 45-2-103(3), MCA (1989). Circumstantial evidence alone may be sufficient to sustain a conviction. State v. Buckingham (1989), 240 Mont. 252, 783 P.2d 1331.

The direct evidence of Brogan's offenses is compelling; however, the circumstantial evidence--such as the animal tracks, the hay placed near the gates, the absence of electric power in the fence, Brogan's request that the wardens return upon learning that they planned to inspect his farm, and his evasive answers when confronted about the events of February 7, 1989--additionally supports any inferences drawn by the District Court, as well as its findings of fact and conclusions of law.

Brogan contends that he is being charged with felony criminal activity, which, he argues, requires proof of concurrent intent. Brogan is mistaken. He was charged under Title 87 of Montana's fish and wildlife statutes. The penalty provision of Title 87 provides that a person who violates any provision of Title 87 is guilty of a misdemeanor. Section 87-1-102, MCA (1989). Brogan's offenses were misdemeanors, not felonies.

Brogan finally argues that he should not be held accountable

15

for the actions of Joe Heimer, his hired hand, who actually closed the gate which entrapped wild elk on Brogan's elk farm. However, Heimer told Warden Weurtz that he closed the gate in accordance with Brogan's instructions. Heimer testified that Brogan wanted the gate closed and Heimer informed Brogan that he would close the gate to the pen. This testimony supports the District Court's finding that Brogan was ultimately responsible for capturing wild elk by luring them into the pen and securing the gate. Brogan raises other arguments which lack merit and need not be addressed.

We hold that sufficient evidence exists in the record to support the District Court's conclusions that: 1) Brogan captured more than 80 head of wild elk for use on his game farm, purposely luring them into his farm enclosures by leaving gates open and baited with hay; and 2) Brogan failed to maintain his fences surrounding the upper mountain pasture and triangular pen.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices