No. 95-249

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

TAREQUE AZIZ AHMED,

    Defendant and Appellant.

FILED

AUG 26 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Larry Moran, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Karl P. Seel, Bozeman, Montana; Steven M. Edwards
and John Houston Pope, Davis, Scott, Weber &
Edwards, New York, New York

    For Respondent:

        Mike Salvagni, Gallatin Count Attorney, Marty
Lambert, Deputy Gallatin County Attorney, Bozeman,
Montana; Joseph P. Mazurek, Attorney General,
Micheal S. Wellenstein, Assistant Attorney General,
Helena, Montana


                Submitted on Briefs:   March 14, 1996

                          Decided:   August 26, 1996

Filed:

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Tareque Aziz Ahmed (Ahmed) appeals the order of the Eighteenth Judicial District Court, Gallatin County, convicting him of one count of aggravated kidnapping and one count of felony assault. We affirm.

## ISSUES

Ahmed raises numerous issues on appeal. We hold the following to be dispositive:

1. Was Ahmed denied his right to a fair trial due to the actual or apparent bias of the District Court?

2. Were Ahmed's convictions for aggravated kidnapping and felony assault supported by substantial credible evidence?

3. Did the District Court abuse its discretion by considering evidence of flight?

4. Did the District Court abuse its discretion by allowing testimony regarding a telephone conversation between Ahmed's New York attorney and a Gallatin County deputy sheriff?

## FACTS

There are two versions of the events which gave rise to this case: the victim's, which the District Court largely found credible, and Ahmed's, which the District Court largely disbelieved.

The victim, J.F., and Ahmed were both students at Montana State University in Bozeman when they became romantically involved in the spring of 1989. They had a stormy, off-again, on-again relationship due at least in part to Ahmed's admitted jealousy and possessiveness. J.F. testified that his jealous behavior alienated several of her friends. She further testified that Ahmed had

2

threatened suicide if she did not remain with him; that he had attempted to fight with a male friend whom she had dated; and that he followed her to work on at least one occasion. Ahmed denied that any of these specific events occurred. In June 1990, Ahmed purchased a nine-millimeter handgun. On at least one occasion, according to J.F., Ahmed threatened to kill her and himself with the gun. On at least two occasions, J.F. returned to her apartment to find Ahmed, uninvited, inside waiting for her.

In August 1990, J.F. went to the MSU campus police to report that Ahmed had followed her to work and was frightening her. She then went to the Bozeman police department and asked that someone speak to Ahmed about his behavior and direct him to leave her alone. That same day, she went to the County Attorney's office to attempt to get a restraining order against him, but was informed that the law in effect at that time would not allow her to obtain one because she and Ahmed were neither married nor living together.

Two days later, a Bozeman police officer spoke to Ahmed about J.F. He advised Ahmed that J.F. no longer wanted to see him and that he should stop showing up at her apartment or attempting to contact her in any way. The officer found Ahmed to be very cooperative; Ahmed expressed surprise at J.F.'s actions in going to the police; promised not to contact her further; and informed the officer of his intention to leave Montana for California in the near future.

According to J.F., she returned to her apartment on September 3, 1990, to find Ahmed waiting for her inside with his puppy. He

3

was armed with the nine millimeter handgun and a Bowie knife, and informed her that he was going to hold her in the apartment for three days. He hit her lightly on the face, held the knife to her neck, and then ordered her into the bedroom to have sex with him.

J.F. testified that she was very frightened and attempted to be nice to Ahmed to prevent him from hurting her. She testified that she tried to act like his girlfriend because she was afraid he would shoot her if she resisted. During the next two days, Ahmed kept J.F. in the house except for one trip to run errands. J.F. testified that the only stop she could remember from the trip was the drive through at the local Burger King, during which he kept the gun on the seat between them. J.F. also periodically took the puppy out into the yard to go to the bathroom. She testified that she made no attempt to escape because she believed Ahmed would shoot her if she tried to run.

On September 5, 1990, Ahmed went to take a shower. J.F. then took the gun and knife and went directly to the Bozeman police department, where she reported the incident. Bozeman police were dispatched to her apartment, but Ahmed was gone. They also checked his apartment but could not find him. They then returned to J.F.'s apartment with J.F. so that she could gather some belongings before going to a friend's house. At that time, J.F. discovered and gave to the police a plastic bag from a sporting goods store which contained a box of 9 mm. ammunition and a receipt from the store.

According to Ahmed's testimony, he went to J.F.'s apartment on September 4, 1990, to collect some belongings and say goodbye.

4

They spent the day together, going to the grocery store, park, gas station, and Burger King, before returning to the apartment where they ordered pizza. Ahmed then spent the night on the couch. The next day, he took a shower. When he finished, he discovered that J.F. was gone and he left as well. He testified that they did not have sexual relations. He further testified that he did not threaten her with the gun or knife, nor did he attempt to restrain her movements.

It is undisputed that on the evening of September 4, 1990, Ahmed caught a ride with friends to Fargo, North Dakota. From there, he took a bus to New York City. Less than a month later, he learned that the Bozeman police were looking for him regarding accusations made by J.F. He hired a New York attorney to "look into" the situation, but made no attempt to contact the Bozeman police himself.

In December, 1992, having been unable to locate Ahmed, the Gallatin County Attorney's office requested that the U.S. Attorney issue a federal unlawful flight warrant for Ahmed. On March 14, 1994, Ahmed was arrested by the FBI is New York City. He was brought back to Bozeman where, in a bench trial, he was tried and convicted of one count of aggravated kidnapping and one count of felony assault. Ahmed appeals. Other facts will be provided as necessary to address the issues raised.

## STANDARD OF REVIEW

In an appeal of a criminal case, the evidence will be viewed in the light most favorable to the prosecution. State v. Martel

(1995), 273 Mont. 143, 148, 902 P.2d 14, 17. When determining whether the evidence presented was sufficient to sustain the criminal conviction, we ask if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Gould (1995), 273 Mont. 207, 221, 902 P.2d 532; State v. Ross (1995), 269 Mont. 347, 360, 889 P.2d 161, 169.

Our standard of review of a trial court's discretionary rulings is whether the trial court abused its discretion. State v. Loh (Mont. 1996), 914 P.2d 592, 596, 53 St.Rep. 226, 228 (citations omitted). Since the admissibility of evidence is a discretionary ruling, we also determine whether the District Court abused its discretion by admitting or refusing to admit disputed evidence. State v. Bristow (1994), 267 Mont. 170, 173, 882 P.2d 1041, 1043 (citations omitted). The standard of review of a district court's conclusions of law is plenary, and we will review to determine whether those conclusions of law are correct. State v. Hansen (1995), 273 Mont. 321, 323, 903 P.2d 194, 195 (citations omitted).

## DISCUSSION

1. Was Ahmed denied his right to a fair trial due to the actual or apparent bias of the District Court?

Ahmed is a native of Bangladesh. He alleges that he was denied his right to a fair trial because the District Court was biased against him due to his race and culture. He alleges that this bias, while not overt, was manifested in several ways. First, he contends that the District Court improperly acted as the trier

6

of fact at trial after having previously presided over Ahmed's bail hearing. Second, he contends that the District Court excessively injected itself into the trial by questioning witnesses and terminating a given line of questioning. Third, he contends that the District Court demonstrated its bias by including an illegal condition of parole. Fourth, he contends that the District Court's findings were not supported by substantial credible evidence, and that this itself was indicative of bias.

A.    The District Court as trier of fact.

The same district court judge who presided over Ahmed's bench trial also had presided over his earlier bail hearing. During the bail hearing, the District Court heard extensive evidence regarding Ahmed's alleged flight from justice. The prosecutor presented this evidence in support of his argument that a high bail was necessary because of the chance that Ahmed would try to flee the jurisdiction again. The District Court agreed that Ahmed was a flight risk and set the bail in the amount requested by the prosecutor.

On appeal, Ahmed points out that whether he had in fact fled the jurisdiction was a seriously disputed question at trial. He contends the District Court improperly decided that issue at the bail hearing. Having allegedly decided this crucial issue previously, Ahmed contends that the District Court was not a truly impartial trier of fact at the trial.

Despite the bias he now alleges, however, at no time prior to this appeal did Ahmed object to having the same judge sit for both

7

the bail hearing and the trial. Section 46-20-104, MCA, provides in part:

> Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affects the judgment. Failure to make a timely objection during trial constitutes a waiver of the objection except as provided in 46-20-701(2).

Section 46-20-104(2), MCA. Section 46-20-701(2), MCA, referenced above, provides:

> No claim alleging an error affecting jurisdictional or constitutional rights may be noticed on appeal, if the error was not objected to as provided in 46-20-104, unless the defendant [convicted person] establishes that the error was prejudicial to his guilt or punishment and that:
>     (a)   the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application;
>     (b)   the prosecutor, the judge, or a law enforcement agency suppressed evidence from the defendant [convicted person] or his attorney that prevented the claim from being raised and disposed of; or
>     (c)   material and controlling facts upon which the claim is predicated were not known to the defendant [convicted person] or his attorney and could not have been ascertained by the exercise of reasonable diligence.

Section 46-20-701(2), MCA. None of the subsections of § 46-20-701(2), MCA, apply in this case. Yet despite the fact that Ahmed is foreclosed from raising this alleged error under the applicable plain error statute, he nevertheless argues that this Court should still notice it under the common law "plain error" doctrine.

The common law "plain error" doctrine is an exception to § 46-20-104, MCA, which allows this Court to remedy instances of manifest injustice which otherwise would not be addressed. State v. Arlington (1994), 265 Mont. 127, 152, 875 P.2d 307, 322. However, this Court will invoke the common law plain error doctrine

8

sparingly, and only in exceptional cases where the failure to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. State v. Finley (Mont. 1996), 915 P.2d 208, 215, 53 St.Rep. 310, 315.

Ahmed argues that the District Court improperly decided the issue of flight based on evidence previously presented at the bail hearing. He further argues that this pre-judging of a crucial issue indicated bias, which in turn indicated that Ahmed did not receive a fair and impartial trial. These circumstances, he argues, justify the invocation of the common law plain error doctrine in this case. We disagree.

Ahmed frames this issue as if the evidence of flight were only presented at the bail hearing. In fact, the prosecutor presented the same evidence regarding flight at trial as he had at the bail hearing, without objection. The District Court properly considered all the evidence presented at trial in reaching its verdict. There is nothing in the record to indicate that it relied upon flight evidence presented at the bail hearing, as opposed to flight evidence presented at trial. Since the District Court's findings were based on evidence properly admitted at trial, we decline to invoke the common law plain error doctrine.

B.    The questioning of witnesses.

Ahmed argues that the District Court demonstrated bias against him by excessively questioning witnesses and by terminating a given

line of questions. In particular, Ahmed assigns error to the District Court's questioning of himself and a clerk from the sporting goods store. He also assigns error to the District Court's curtailing of a certain line of questions pursued by the prosecution.

The District Court questioned Ahmed at trial regarding his immigration status after Ahmed had invoked his Fifth Amendment right not to incriminate himself and after defense counsel objected to the line of questioning. After trial, the District Court determined that it had erred in questioning Ahmed regarding his immigration status. It therefore sustained the defense's objection and ordered the pertinent testimony stricken. Since this was a bench trial, the manner in which a jury might interpret such questions was not and is not an issue. Ahmed nevertheless contends that the mere asking of improper questions regarding his immigration status is evidence of the District Court's bias against him.

Racial prejudice or bias against a defendant is a heavy charge to make against a court. Such bias is, of course, antithetical to the fundamental proposition that all people are entitled to a fair trial by an impartial court of law. Such a serious accusation must be backed by evidence which tends to show its validity, not simply by mere speculation which cannot be traced to a single fact in the record.

Although in this case the questions put to the defendant by the District Court were admittedly improper, there is no evidence

that the District Court considered the stricken testimony when reaching its verdict. If a defendant's objection is sustained, the offending testimony is stricken from the record, and the jury is instructed to disregard the evidence (in cases of jury trials), the error which was committed is presumed to be cured. State v. West (1992), 252 Mont. 83, 91, 826 P.2d 940, 945. Ahmed fails to offer any specific evidence of bias to rebut the presumption that the District Court adequately cured its error. Far from rebutting the presumption of cure, Ahmed asks this Court to presume bias from the mere posing of such questions. We refuse to do so. While the District Court admittedly erred in asking Ahmed about his immigration status, it properly cured its error by sustaining the defense's objection and striking the offending testimony.

Ahmed also argues that the District Court improperly questioned a sporting goods store clerk regarding a receipt, found in J.F.'s apartment, which reflected the purchase of a box of 9 mm. bullets two days before the incident in question. He also argues that the District Court erred by curtailing a certain line of questioning being pursued by the prosecution.

However, Ahmed did not preserve either of these assertions of error by means of a contemporaneous objection as is required by § 46-20-104(2) and § 46-20-701(2), MCA. "This Court has made it clear that where a defendant does not object at trial to the remarks and conduct of the trial judge, the issue will not be considered upon appeal." State v. Martin (1987), 226 Mont. 463, 467, 736 P.2d 477, 480 (citing State v. Lloyd (1984), 208 Mont.

11

195, 676 P.2d 229). Because these issues were not properly preserved for appeal, we decline to address them.

C. The illegal condition of parole.

When sentencing Ahmed, the District Court ordered:

Should the defendant be paroled, under no circumstances may he be released to any state or territory of the United States. The defendant shall remain in custody at all times unless, having been paroled, he is deported.

Further, the defendant shall be ineligible for re-entry into the United States, and shall be subject to arrest and imposition of any time remaining on his sentence should he re-enter the United States or its territories.

Ahmed contends, and the State concedes, that this is an illegal condition of parole. It is beyond the jurisdiction of a district court to order anyone deported without due process or to absolutely bar re-entry into the United States. Boutilier v. INS (1967), 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661; United States v. Castillo-Burgos (9th Cir. 1974), 501 F.2d 217 (cert. denied, 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284). Ahmed further contends, however, that the imposition of an illegal condition of parole indicates the District Court's inherent racial and cultural prejudice against him.

As stated above, such charges cannot be based on mere speculation or conjecture. Ahmed is admittedly not a citizen of this country. He is also, now, a convicted felon and dangerous offender. Under the circumstances, the District Court might well believe that justice and society would be best served by deporting Ahmed after he is paroled. The parole provision is illegal not because it is racist or biased, but because it does not take into

12

consideration Ahmed's right to procedural due process before deportation. Because it is illegal, we hold that the subject parole condition must be stricken. Inclusion of the illegal provision does not, however, indicate inherent judicial bias warranting reversal of Ahmed's convictions.

D. The lack of evidence as indicative of bias.

Ahmed asserts that the District Court's bias against him is also illustrated by the fact that it convicted him of felony charges which the evidence presented did not support. This is merely another way of saying that the evidence was insufficient to sustain the convictions. Therefore, we next turn our attention to the question of the sufficiency of the evidence.

2. Were Ahmed's convictions for aggravated kidnapping and felony assault supported by substantial credible evidence?

Ahmed argues that his convictions for aggravated kidnapping and felony assault must be reversed because they are not supported by substantial credible evidence. Ahmed notes that, since only he and J.F. were present during the period when the offenses took place, the case essentially comes down to his word against hers. He argues that J.F.'s testimony was inherently incredible and uncorroborated and, as such, is insufficient to support the convictions.

Ahmed claims that J.F.'s testimony was inherently incredible because it was contradicted not only by Ahmed's testimony, but also by her own prior statement made to the police after the events in question occurred. Ahmed further argues that J.F.'s testimony was not corroborated by physical evidence such as bruises or scratches

13

from when she claimed he had struck her and held a knife to her neck. In the face of these inconsistencies and lack of corroboration, Ahmed argues that the evidence presented was insufficient to convict him of the crimes with which he was charged.

As this Court stated in State v. Brogan (1993), 261 Mont. 79, 862 P.2d 19:

> [w]here the sufficiency of the evidence is at issue on appeal in a criminal bench trial, the standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Brogan, 862 P.2d at 24. Moreover, the credibility of witnesses and the weight to be given to their testimony are to be determined by the trier of fact, and disputed questions of fact and credibility will not be disturbed on appeal. Brogan, 862 P.2d at 24. See also State v. Santos (1995), 273 Mont. 125, 131, 902 P.2d 510, 514; State v. Moreno (1990), 241 Mont. 359, 361, 787 P.2d 334, 336. In the event that the evidence conflicts, it is within the province of the trier of fact to determine which will prevail. Santos, 902 P.2d at 514 (citing State v. Flack (1993), 260 Mont. 181, 860 P.2d 89).

In State v. Maxwell (1982), 198 Mont. 498, 647 P.2d 348, this Court held that prior inconsistent statements do not necessarily render a witness's testimony inherently incredible. On the contrary:

> [o]nly in those rare cases where the story told is so inherently improbable or is so nullified by material self-contradictions that no fair-minded person could

14

> believe it may we say that no firm foundation exists for
> the verdict based upon it.

Maxwell, 647 P.2d at 351 (quoting State v. Gaimos (1916), 53 Mont.
118, 126, 162 P. 596, 599). Further, the testimony of one witness
is sufficient to establish a fact, Santos, 902 P.2d at 514, and the
absence of corroboration alone is not sufficient reason to distrust
the testimony of a complaining witness. State v. Higley (1980),
190 Mont. 412, 427, 621 P.2d 1043, 1052.

The District Court heard all the evidence presented as well as
the testimony of both J.F. and Ahmed. It noted that J.F. had
explained that her testimony differed, in part, because she could
not remember some of the details she had reported to the police in
her written statement. Noting that the trial took place almost
four years after the events in question, the District Court found
her to be candid in admitting when she simply could not remember
certain details. The District Court included in its findings all
the contradictions of which Ahmed complains, yet it still found
J.F.'s testimony to be more credible than his. Looking at the
evidence in the light most favorable to the prosecution, we hold
that sufficient evidence existed for the District Court to convict
Ahmed of the crimes charged.

3. Did the District Court abuse its discretion by
considering evidence of flight?

Ahmed contends that the District Court abused its discretion
by considering evidence regarding how and when he left Montana, and
by construing that evidence as proof of flight. He admits that
flight evidence may be admitted as a circumstance tending to show

15

consciousness of guilt. State v. McKimmie (1988), 232 Mont. 227, 231, 756 P.2d 1135, 1138. But he also contends that flight evidence is admissible only if the District Court is satisfied that the crime charged has in fact been committed by someone. State v. Pepperling (1974), 166 Mont. 293, 299, 533 P.2d 283, 287.

In this case, the question faced by the District Court was not who committed a given crime, but rather whether a crime occurred at all. Ahmed argues that the District Court employed circular reasoning. He contends that the District Court concluded that evidence of flight is admissible to infer consciousness of guilt because a crime was committed, but then found that a crime was committed because Ahmed allegedly fled.

Ahmed misconstrues the decision of the District Court. In order to convict Ahmed of the crimes charged, the State had to show both that the crimes were committed and that Ahmed was the person who committed them. Having found from the testimony of J.F. and other witnesses that the crimes charged did in fact occur, the District Court properly considered flight evidence in reaching the conclusion that Ahmed was the one who committed them.

It is undisputed that, on the same evening that J.F. took the gun and went to the police, Ahmed left the state for Fargo, North Dakota. He then took a bus to New York City where he remained for the next three and a half years, knowing that the Bozeman police department was looking for him. He left Montana on the night in question without taking his car or the new puppy he had recently acquired, and without forwarding his mail. He headed to New York

16

although he had previously informed the police that he intended to go to California. Based on this evidence, the District Court concluded that Ahmed had fled from Bozeman to avoid arrest or prosecution for his crimes.

Ahmed argues that the foregoing does not establish that he was fleeing from criminal charges because, in reality, no crimes had occurred. According to him, after spending the day "saying goodbye" to J.F., he left the state according to plan. This, however, is merely a reargument of the sufficiency of the evidence. The District Court concluded that Ahmed had held J.F. in her apartment against her will for almost three days and that, in the course of that time, he caused her reasonable apprehension that he would seriously injure her with the gun or the knife. As stated above, the evidence presented was sufficient to justify such a finding. Having satisfied itself that the crimes alleged did in fact occur, the District Court did not err in considering flight evidence in order to infer that Ahmed was conscious of his own guilt.

4. Did the District Court abuse its discretion by allowing testimony regarding a telephone conversation between Ahmed's New York attorney and a Gallatin County deputy sheriff?

When Ahmed learned about the charges pending against him, he retained a New York attorney in an attempt to have the attorney "look into" the matter. At trial, a Gallatin County deputy sheriff testified that he had received several phone calls from Ahmed's attorney. He further testified that the attorney had inquired into the circumstances of the charges and indicated a desire to resolve

17

the situation. The deputy sheriff also testified to telling the attorney that the situation could only be resolved by Ahmed's returning to Montana to face the charges. The attorney then indicated that he would advise Ahmed to turn himself in.

Defense counsel objected to this entire line of questioning on the grounds that it was impermissible hearsay evidence. The State responded that the testimony was admissible as a statement of a party-opponent made through an agent, which is not hearsay under Rule 801(d)(2)(C) and (D), M.R.Evid. We agree with the State.

Rule 801(d) provides, in part:

> Statements which are not hearsay. A statement is not hearsay if:
>
> . . .
>
> (2) Admission by a party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of that relationship . . . .

Rule 801(d)(2)(C) and (D), M.R.Evid. Ahmed testified that he had retained the New York lawyer in an effort to resolve the charges against him. In attempting to do so, the attorney called the Gallatin County deputy sheriff to discuss the status of the case. In so doing, the attorney was acting as an agent for Ahmed. He was representing Ahmed's interests and following Ahmed's instructions by exploring how the charges might be resolved. The disputed conversation took place during the existence of the agency relationship, and the attorney's comments concerned a matter within the scope of that relationship. Therefore, the attorney's

18

statements were not hearsay and the District Court properly refused to exclude them on that basis.

Ahmed also argues that the testimony should have been excluded because it constituted a violation of his attorney-client privilege. In Montana, the attorney-client privilege is codified in § 26-1-803, MCA, which states:

> (1) An attorney cannot, without the consent of his client, be examined as. to any communication made by the client to him or his advice given to the client in the course of professional employment.
> (2) A client cannot, except voluntarily, be examined as to any communication made by him to his attorney or the advice given to him by his attorney in the course of the attorney's professional employment.

By its terms, this statutes applies to communications made by a client to an attorney or vice versa. In this case, however, the attorney made the disputed statements to a third party, the Gallatin County deputy sheriff.

Ahmed correctly cites Palmer v. Farmer Ins. Exchange (1993), 261 Mont. 91, 861 P.2d 895, as standing for the proposition that an attorney may not disclose advice given to his client without the consent of the client. Palmer, 861 P.2d at 906. However, Palmer is not on point for two reasons. First, Ahmed's attorney did not reveal advice he had given to Ahmed, but rather conveyed what he intended to tell him. Second, Ahmed implicitly consented to the entire conversation by directing his attorney to attempt to take care of the charges. In contrast, Palmer concerned an attempt by a claimant to compel production of confidential files detailing communications between an insurer and its attorney. Voluntary

19

disclosure to a third party was not the issue in <u>Palmer</u> and, therefore, it is not on point.

Because the conversations between the Gallatin County deputy sheriff and Ahmed's attorney involved communications made by an agent in the course of his agency, they were not hearsay. Because the conversations took place between the attorney and a third party, with the client's implicit consent, they are not subject to the attorney-client privilege. Accordingly, the District Court did not abuse its discretion by allowing the deputy sheriff's testimony.

Ahmed raises several other specifications of error regarding various testimony which he claims the District Court should not have allowed into evidence. However, a review of the record reveals that no objections were made at trial to any of the testimony in question. As articulated in the discussion of issue 1(a), the lack of a contemporaneous objection precludes this Court from considering an alleged error. Section 46-2-104, MCA; <u>Arlington</u>, 875 P.2d at 321. Nor do any of the alleged errors justify invocation of the common law plain error doctrine. Because these issues were not properly preserved for appellate review, we decline to address them.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

20

Justices

21

Justice W. William Leaphart delivered the Opinion of the Court.

I dissent. In my view, the trial court's final decision in this matter was colored by the fact that the court impermissibly questioned Ahmed as to whether he was an illegal alien while living in New York. The court pursued this line of questioning despite Ahmed's invocation of his 5th Amendment right not to incriminate himself. Although the court, in a post-trial order, sustained defense counsel's objection to these questions and struck the testimony, the trial court's findings of fact and conclusions of law contain references suggesting that the court did consider Ahmed's testimony as to his immigration status. In Finding #15, the court noted that "Defendant was 'out-of-status' in the spring of 1990." In Finding #17, the court stated:

> An alien who marries a U.S. citizen may, upon petition from the citizen-spouse, be allowed to stay in the U.S. It was likely that the Defendant would have been permitted to remain in the U.S. if his citizen-spouse were to file an appropriate petition. Defendant had extra incentive to win J.F. back during the summer of 1990.

Clearly, despite the fact that testimony as to Ahmed's immigration status was elicited in violation of his 5th Amendment rights, the court put much store by the fact that Ahmed was "out-of-status" with the INS. Furthermore, the court's reasoning that Ahmed's out-of-status situation gave him incentive to win J.F. back is tenuous at best. Agent Sprekelmeyer testified that there is no status granted or changed as a result of an alien's marriage to a U.S. citizen. Rather, as a matter of *grace*, the Attorney General may allow out-of-status aliens to remain in the U.S. *if* they are making

22

application for adjustment of status. Although the Attorney General does not generally choose to deport out-of-status aliens married to U.S. citizens, "they are deportable during that period of time." If validating his status with the INS were Ahmed's ultimate goal, it would be more logical to conclude that Ahmed would seek to cure his out-of-status situation by, as Agent Sprekelmeyer acknowledged, merely filing an application for reinstatement as a student. This would certainly be a quicker and more effective way to reinstate his status than pursuing a forced marriage with a U.S. citizen when marriage alone would not change his status.

I would also reverse due to the court's allowing Lt. Cashell to testify, over objection, as to the contents of a phone conversation Cashell had with Ahmed's attorney Mr. Gadye. Gadye placed a call to Cashell to discuss the case. In the context of discussing how to resolve the charges, Cashell testified that Gadye said he would advise Ahmed to surrender himself. This hearsay statement by defense counsel during the course of settlement discussions had no probative value. It was not an admission by Ahmed. It was merely a statement by Gadye as to what he intended to tell Ahmed. There was no evidence that he, in fact, passed this advice on to Ahmed. Ahmed was put in the position where he could not rebut this testimony without revealing privileged communications he had with his counsel. The hearsay had no probative value and yet was highly prejudicial to Ahmed.

The State argues that Gadye's statement was not hearsay under

23

Rule 801(d)(2)(C) and (D), M.R.Evid., which excludes from hearsay

> (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of that relationship . . . .

Clearly, Rule 801 contemplates the admission of statements which reflect information or positions that the party (here, the defendant) has communicated to the agent and has authorized the agent to discuss. It does not contemplate the admission of information or advice which is flowing the other direction. That is, from counsel to client (the defendant). It is one thing to hold Ahmed responsible for positions that originate with him or that he has authorized. It is quite another to hold him to positions taken by another when the position may not have even been communicated to or discussed with Ahmed. What someone intended to tell Ahmed is totally irrelevant to what Ahmed in fact knew or contemplated. The court's reliance on this hearsay testimony in its findings indicates that it was a significant, and, I submit, improper, factor in the court's analysis.

For the above reasons, I would reverse the conviction.

_W. William Beyphunt_
Justice