NO.   95-335

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

   v.

DAVID B. LAMBERT,

      Defendant and Appellant.

FILED

DEC 16 1996

STATE OF MONTANA

APPEAL FROM:   District Court of the Twenty-First Judicial District
In and for the County of Ravalli,
The Honorable Jeffrey Langton, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

         William F. Hooks, Appellate Defender, Helena,
Montana

      For Respondent:

         Joseph P. Mazurek, Attorney General, Cregq W.
Couqhlin, Assistant Attorney General, Helena,
Montana; George Corn,. Ravalli County Attorney,
Hamilton, Montana

Heard: September 19, 1996
Submitted: September 19, 1996

Decided:;.; December 16, 1996

Filed:

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court

Following a jury trial in the Twenty-first Judicial District court, Ravalli County, David B. Lambert (Lambert) was found guilty of criminal endangerment, a felony, and was sentenced to a term of years at the Montana State Prison. Lambert appealed.

We reverse and remand with instructions.

We address the following issue:

Did the District Court apply an incorrect mental state element to the offense of criminal endangerment?

FACTS

On August 20, 1994, Christine Peterson, along with her three children and a friend of theirs, was driving south on U.S. Highway 93 toward Darby, Montana, Peterson's hometown. The group had just spent the day in Missoula shopping for school clothes. As they approached the town of Stevensville, travelling at about 50 or 55 miles per hour, Ms. Peterson saw a car pulling out of a roadside parking lot to her left. That car, driven by Lambert, proceeded across the highway immediately ahead of Ms. Peterson's car, and Ms. Peterson applied her brakes, expecting to collide with the middle or rear side of Lambert's car. Instead, Lambert turned his car toward Ms. Peterson's car; his car was now facing north in Ms. Peterson's southbound lane, and the two vehicles collided head-on.

Witnesses at the scene immediately after the collision occurred noted that Lambert smelled and acted as if he had been drinking. A Montana highway patrol officer, after questioning Lambert and conducting a field sobriety test, determined that

2

Lambert had indeed been drinking and suspected that he was intoxicated. Lambert was unable to provide the officer a driver's license or proof of auto insurance, and the officer soon discovered that Lambert's driving privileges had previously been revoked. Lambert was **ultimately** charged with the following offenses: criminal endangerment; DUI; driving while license suspended or revoked; failure to have auto insurance; and failure to use a seatbelt.

Lambert proceeded to trial on the charges of **criminal** endangerment and DUI, having previously entered guilty pleas to the other three charges. After the State presented its case-in-chief, Lambert moved for an acquittal of the criminal endangerment charge, claiming that the State had not proven beyond a reasonable doubt that Lambert had acted "knowingly," the requisite mental state for the offense of criminal endangerment. The court denied Lambert's motion, after first hearing arguments from Lambert and the State regarding which definition of "knowingly" applied to criminal endangerment.

After the defense rested without calling any witnesses, the parties and the court settled jury instructions. The court decided to instruct the jury on three out of four definitions of "knowingly" contained in a pattern jury instruction, and to instruct the jury that Lambert did not need to intend the result that occurred in order to have acted with the requisite mental state. The court also decided to instruct the jury that a person in an intoxicated condition is criminally responsible for his

conduct, and that an intoxicated condition could not be taken into account in determining the existence of a mental state which is an element of the offense. Lambert objected to these instructions.

The jury returned a verdict finding Lambert guilty of criminal endangerment, but did not return a verdict on the DUI charge. Lambert was subsequently sentenced to a term of years at the Montana State Prison. This appeal followed.

DISCUSSION

Did the District Court apply an incorrect mental state element to the offense of criminal endangerment?

Lambert argues that the District Court misinterpreted the meaning and application of "knowingly," the mental state element of the offense of criminal endangerment. We review a district court's interpretation or application of the law to determine if that interpretation or application was correct. State v. Christensen (1994), 265 Mont. 374, 877 P.2d 468.

Section 45-5-207(1), MCA, provides, in pertinent part, that a person commits the offense of criminal endangerment if he "knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another." Section 45-2-101(34), MCA, provides multiple definitions of "knowingly":

> [A] person acts knowingly with respect to conduct or to
> a circumstance described by a statute defining an offense
> when the person is aware of the person's own conduct or
> that the circumstance exists. A person acts knowingly
> with respect to the result of conduct described by a
> statute defining an offense when the person is aware that
> it is highly probable that the result will be caused by
> the person's conduct. When knowledge of the existence of
> a particular fact is an element of an offense, knowledge

is established if a person is aware of a high probability
of its existence.

In denying Lambert's motion for acquittal, the court determined that "knowingly," the mental state 'element of the offense of criminal endangerment, could be established by evidence showing that a defendant was aware of his conduct. The court decided that the State had presented sufficient evidence on this issue for the case to go to the jury. Later, when settling jury instructions, the court determined that it would instruct the jury as to three distinct definitions of "knowingly." Instruction No. 12, given to the jury, reads as follows:

Knowingly

A person acts knowingly:

(1) *when he is aware of his conduct or*

(2) when he is aware under the circumstances that his conduct constitutes a crime or

(3) when he is aware there exists the high probability that his conduct will cause a specific result. (Emphasis added.)

Lambert argues that the court applied an incorrect mental state element to the offense of criminal endangerment, and that the court, in relying on this mistaken interpretation of the law, erred in denying Lambert's motion for an acquittal and erred in instructing the jury with respect to the applicable definition of "knowingly." We will review the court's interpretation of the law, and then determine whether it was proper for the court to rely on

this interpretation of the law in denying Lambert's motion for acquittal and in instructing the jury.

Lambert contends that the different definitions of "knowingly" found in § 45-2-101(34), MCA, distinguish between different elements of criminal offenses, and that therefore "the statute defining the offense" governs which definition of "knowingly" applies. Lambert contends that the offense of criminal endangerment is defined in terms of the result of conduct. Under that construction, Lambert argues that in order to prove the "knowingly" element of criminal endangerment beyond a reasonable doubt; the State must establish that an accused was aware of the high probability that his conduct would cause a substantial risk of death or serious bodily injury to another. Lambert contends that we reached this same conclusion in State v. Crisp (1991), 249 Mont. 199, 814 P.2d 981.

In Crisp, we rejected a constitutional challenge to the criminal endangerment statute. The defendant in that case alleged that the statute was unconstitutionally vague because it did not require a specific intent to cause the substantial risk. We noted that the appropriate mental state was "knowingly," set out the definitions of "knowingly" provided in § 45-2-101(33), MCA (these same definitions of "knowingly" are now found in § 45-2-101(34), MCA (1995)), and concluded that "[a]ccordingly, a defendant commits the crime of criminal endangerment when he is aware that there is a high probability that his conduct may cause a substantial risk of death or serious bodily injury to another." Crisp, 814 P.2d at 983.

6

The State argues that our holding in Crisp does not imply that there can be only one definition of "knowingly" applied to the offense of criminal endangerment. Put another way, the State argues that in defining criminal endangerment as we did in Crisp, we were merely asserting one of a number of different definitions of "knowingly" that could apply. The State also contends that Crisp is not controlling here because the issue of which definition of "knowingly" applied to criminal endangerment was not before us in that case. In any event, the State argues that the definition of "knowingly" that we used in Crisp was incorrect; the language of the criminal endangerment statute plainly provides that "knowingly" refers to a defendant's conduct, not the result of his conduct.

While we agree with the State that our holding in Crisp does not directly control the disposition of the matter before us, we cannot agree that in Crisp we applied the wrong definition of "knowingly" to the offense of criminal endangerment. Moreover, we cannot agree that any one of the definitions of "knowingly" found in § 45-2-101(34), MCA, is applicable to the offense of criminal endangerment. Finally, agreeing as we do that the issue of what definition of "knowingly" applies to this offense has not previously been before this Court does not require us to ignore how we have consistently articulated the elements of criminal endangerment. See Criso, 814 P.2d at 983; State v. Smaage (1996), 276 Mont. 94, 98, 915 P.2d 192, 195. We find Lambert's arguments persuasive, and dispose of this issue in his favor.

7

Our reading of the criminal endangerment statute is that it emphasizes result over conduct. The portion of the statute that we are reviewing here does not particularize the conduct that, if engaged in, results in the commission of the offense. Rather, a person may engage in a wide variety of conduct and still commit the offense of criminal endangerment, provided that the conduct creates a substantial risk of death or serious bodily harm. It is the avoidance of this singular result, the risk of death or serious harm, that the law attempts to maintain.

There being no particularized conduct which gives rise to criminal endangerment, applying to that offense's mental element the definition of "knowingly" that an accused need only be aware of his conduct is incorrect. It is the appreciation of the probable risks to others posed by one's conduct that creates culpability for criminal endangerment; were it otherwise, where culpability could lie for mere appreciation of one's conduct, such as driving a car or shooting a hunting rifle, some very unfair results could follow.

In our view, the relevant statutory scheme recognizes and addresses these concerns. As Lambert points out, § 45-2-101(34), MCA, provides on the one hand that "a person acts knowingly *with respect to conduct . . . described by a statute* defining an offense when the person is aware of the person's own conduct . . ..", and provides on the other hand that "[a] person acts knowingly *with respect to the result of conduct described by a statute* defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct." (Emphasis

8

**added.** )  Conduct is not described by § 45-5-207(1), MCA, but the result of conduct is:  "a substantial risk of death or serious bodily harm."

In addition, § 45-2-103(4), MCA, explains that "[i]f the statute defining an offense prescribes a particular mental state with respect to the offense as a whole without distinguishing among the elements of the offense, the prescribed mental state applies to each element." The criminal endangerment statute provides that the mental state "knowingly" applies, without apparent distinction, to the elements (1) engage in conduct (2) that creates a substantial risk of death or serious bodily harm to another.  According to § 45-2-103 (4), MCA, "knowingly" applies to both conduct and the result of that conduct.

We conclude that the "knowingly" element of criminal endangerment  contemplates a defendant's awareness of the high probability that the conduct in which he is engaging, whatever that conduct may be, will cause a substantial risk of death or serious bodily injury to another.

We hold that the District Court incorrectly applied as the mental element of the offense of criminal endangerment the definition of "knowingly" that a defendant need only be aware of his conduct.  We also hold when the District Court relied on this misinterpretation of the law in denying Lambert's motion for acquittal and in instructing the jury, the court committed reversible error.   The general effect of the court's misinterpretation, manifest in the two rulings complained of, was

9

to alter the State's burden of proving beyond a reasonable doubt the elements of the offense: to prove that a defendant was aware of his conduct is one thing; to prove that he was aware of the high probability of the risks posed by his conduct is quite another. The particular effect of the court's interpretation is a violation of due process rights as provided by Article II, Section 17 of the Montana Constitution.

We remand this case to the District Court to reconsider the motion for acquittal under the standard set forth in this opinion. If the evidence presented at trial was'not sufficient to establish the element that the defendant was aware of the high probability of the risk posed by his conduct, the motion for acquittal must be granted. If the court finds that the State's evidence was sufficient to withstand the motion for acquittal, then the court must grant a new trial because of the erroneous jury instruction. We reverse and remand for reconsideration of appellant's motion for acquittal. If the motion for acquittal is denied then a new trial must be granted.

Reversed and remanded with instructions.

_____
                        Justice

We Concur:


_____
        Chief Justice

_____

_____
Justices

Justice Terry N. Trieweiler specially concurring.

I concur with the majority opinion. I write in response to the dissent which, in my opinion, ignores the plain language of the statute we have been asked to construe, relies on authorities which are not remotely related to the issue we have been asked to decide, and would treat simple negligence as a felony punishable by ten years in prison and a $50,000 fine.

Although the dissent correctly states that when we interpret a statute we should neither insert what has been omitted nor omit what has been inserted, the dissent repeatedly omits critical language from § 45-5-207, MCA, when it discusses that statute. The criminal endangerment statute does not, as the dissent suggests, simply punish someone who "knowingly engages in conduct." It punishes someone who "knowingly engages in conduct that creates a substantial risk of death or serious bodily injury." Any straightforward analysis of what "knowingly" refers to in the criminal endangerment statute **must** include the qualitative description of the kind of conduct that is engaged in. The dissent repeatedly ignores that critical language.

For example, it is clear, based on the plain language of the statute, that it would not be sufficient to prove that a person knowingly drove in a northerly direction in a southbound lane if he or she assumed that the road was closed for construction. The statute, by its plain terms, would only punish that type of conduct if a person drove in a northerly direction in a southbound lane knowing that southbound traffic might also be using that lane. Any

12

other interpretation is nonsensical.  It is not knowingly engaging in conduct that is prohibited; it is knowingly engaging in a specific type of conduct that is prohibited.  It is impossible to grammatically separate "knowingly" from the specific danger presented by a person's conduct.

The dissent goes to great lengths to point out that based on the facts in this case there was, obviously, evidence that Lambert was aware that his conduct would create a substantial risk of harm to others.  I agree.  However, it is impossible for us to say that his conviction was based on a finding by the jury that he was aware that his conduct presented a substantial risk of harm to others because the jury was never properly advised that that kind of finding had to be the basis for its verdict.  Therefore, it makes no difference what a rational trier of fact could have found based on the evidence in this case, because we do not know what this jury would have found had it been correctly instructed regarding the law applicable to this case.

None of the cases cited by the dissent involved an issue regarding the necessary mental state for the crime of criminal endangerment.  None of them involved a jury instruction related to the necessary mental state for the crime of criminal endangerment.  At most, they discuss facts, and conclude that those facts could or could not suffice to support a conviction for the crime.  Therefore, I see no point to the dissent's reliance on them as authority for the issue with which we are concerned in this case.

13

In this case, there is evidence that the defendant, after consuming alcoholic beverages, entered the highway in the wrong direction, knowing that to do so would create a substantial risk of harm to other motorists on the highway. However, based on the argument of the dissent, the same conduct could be punished as a felony under circumstances which would have led no one to believe that it was dangerous. For example, assume that the same stretch of highway was under construction and was closed off to through traffic at points north and south of Lambert's point of entry. Assume that instead of Lambert entering the highway at that location, a vehicle driven by an employee of the State Department of Transportation turned onto the highway, proceeding in a northerly direction in the southbound lane, but believing that the highway barricades would be honored and no one else would be using the highway. Further assume that it was Lambert proceeding in the southbound lane, but that he had ignored the construction signs, and therefore, collided with the Transportation Department vehicle. Based on the dissent's interpretation of the criminal endangerment statute, it would be the driver of the Transportation Department vehicle who committed a felony punishable by ten years in prison and a $50,000 fine because the driver of that vehicle knowingly engaged in the same conduct that Lambert engaged in in this case. The fact that the driver of that vehicle had every reasonable expectation that what he did was safe would make no difference under the law.

14

The dissent is based on a grammatically incorrect reading of the statute, finds no support in the prior decisions of this Court, and would lead to absurd results.

For these reasons, I concur with the majority opinion.

_____
Justice

Justice W. William Leaphart, specially concurring.


I concur in the opinion of the Court and write separately to address what I see as the fallacy in the reasoning of the dissent. At issue is the question of which definition of "knowingly" is appropriate in the context of a charge of criminal endangerment. Knowingly" is defined in § 45-2-101(33), MCA (1993), as follows:

> [A] person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct. When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence. Equivalent terms, such as "knowing" or "with knowledge", have the same meaning.

The trial court used the smorgasbord approach and instructed the jury such that it could employ any one of the definitions contained in § 45-2-101(33), MCA (1993). Court's instruction #12 read as follows:

A person acts knowingly:

(1)  when he is aware of his conduct or

(2)  when he is aware under the circumstances that his conduct constitutes a crime or

(3)  when he is aware there exists the high probability that his conduct will cause a specific result.

In rejecting this approach, the majority has held that, in essence, the court cannot give the jury the choice of which definition applies to the crime charged; rather, the statute defining the crime dictates which definition of "knowingly" is appropriate.

The first of the three definitions presented to this jury

16

stated: "A person acts knowingly when he is aware of his conduct." Although some crimes only require that a person engage in conduct, without regard to any result, criminal endangerment is not such a crime. For example the charge of issuing a bad check, § 45-6-316(1), MCA, only requires:

> (1) A person commits the offense of issuing a bad check when the person issues or delivers a check or other order upon a real or fictitious depository for the payment of money knowing that it will not be paid by the depository.

In a trial for issuing a bad check, it would be appropriate to instruct the jury that a person acts "knowingly" when he is aware of his conduct, that is, when he is aware that the check will not be paid by a depository. The crime, by definition, focuses entirely upon conduct. The crime is complete upon passing of the bad check regardless of any result. That is, it matters not whether anyone attempts to negotiate the check or whether anyone is defrauded.

The § 45-2-101(33), MCA (1993), definitions of "knowingly" draw a distinction between (1) statutes which do nothing more than proscribe conduct (without regard to result), and (2) statutes which not only describe conduct, but also focus on the result of that conduct.

Justice Nelson in his dissent contends that the crime of criminal endangerment is similar to a bad check charge in that it does not require that the defendant act knowingly with respect to the result of the conduct. Specifically, he reviews numerous decisions of this Court involving criminal endangerment and concludes that:

17

>In each case we have focused on *conduct* which *creates a*
>*substantial risk* as that which is proscribed by a
>statute. The result of that conduct was wholly
>irrelevant in our prior decisions. It was irrelevant
>that no particular victim was identified as being put at
>risk by the conduct at issue; it was irrelevant that no
>one was actually injured by the conduct at issue.
>Rather, we focused entirely on the risk-creating nature
>of each defendant's conduct.

For example, Justice Nelson cites State v. Smaage (1996), 276 Mont. 94, 915 P.2d 192, which involved a defendant with eight prior DUIs who was convicted of criminal endangerment. While drunk, Smaage swerved down a city street during early morning traffic. Smaase, 915 P.2d at 193. Smaage's conduct was the driving while drunk. However, in order to convict him of criminal endangerment, the State had to do more than prove that he was aware that there was a high probability of his conduct, that is, prove more than that he knowingly drove his car while drunk. As Justice Nelson points out, the State did not have to prove that his conduct actually resulted in bodily injury. It did, however, have to prove that he was aware that there was a high probability that his driving, under those circumstances, created a specific result, that is, a substantial *risk* of death or serious bodily injury. Smaase, 915 P.2d at 194.

Justice Nelson seems to read conduct as including the risk inherent in the conduct; that the conduct and the result are one in the same. In contrast, the Court's decision is premised on the understanding that the risk (the endangerment) is the *result* of the conduct. This dichotomy is necessary in order to maintain the distinction drawn by § 45-2-101(33), MCA (1993), between offenses which proscribe conduct (e.g., issuing bad checks) without regard

18

to result from offenses which proscribe conduct which creates a specific result. For example, the crime of unlawful restraint, § 45-5-301, MCA, defines the offense as follows:

> (1) A person commits the offense of unlawful restraint if he knowingly or purposely and without lawful authority restrains another so as to interfere substantially with his liberty.

The conduct involved is the restraining of another individual. The result is the substantial interference with liberty.

Justice Nelson apparently agrees that the defendant must be aware of the risk factor. The difference is that he sees the risk factor as being part and parcel of the conduct, rather than a "result" of the conduct. Although this may not appear to be a meaningful distinction, in the context of § 45-2-101(33), MCA (1993), there is a substantive difference. By way of example, assume that three men are standing in a field and each has a rifle. Jones fires to the west where there is nothing but open field. Smith fires to the south in the direction of a grove of trees. Unbeknownst to Smith, there is a house in the grove of trees. Johnson fires to the north where, in plain view, there is a cluster of houses. Each of these men knowingly engaged in the same conduct, i.e., shooting a rifle. However, the legal consequence of any one man's conduct will vary depending upon his awareness. Jones' conduct did not create a risk of harm. Smith's conduct did create a risk of harm but he was unaware of that risk. Johnson's conduct resulted in a risk of harm of which he should have been aware.

Under the instruction given in the present case, a jury would most likely find that each man was aware of his conduct (shooting

19

the rifle) The first definition of "knowingly" would therefore be satisfied. Thus, Smith could be found guilty of criminal endangerment even though he had no "knowledge" of the risk. Such a result does not jibe with the definition of criminal endangerment. Rather, in order to convict of criminal endangerment, the State must prove that the defendant was aware that it was highly probable that the result (the risk) would be caused by the person's conduct.

In deliberating a charge of criminal endangerment, the jury should not be given the option of definition #1: "A person acts knowingly when he is aware of his conduct." This definition does not bring the element of risk (endangerment) into the definition. It does not state that risk is considered to be inherent in the conduct nor does it state (like definition #3) that he must be aware of the high probability of a result. Were the jury to convict on the basis of definition #1, the State would be relieved of its burden of proving that, despite being aware of the risks, the defendant proceeded to engage in the conduct in question. In the absence of such proof, negligent endangerment and criminal endangerment become indistinguishable.

Section 45-2-101(33), MCA (1993), sets forth separate definitions of knowingly. In determining which definition is appropriate, the court must look to the requirements of the offense charged. The court cannot simply instruct the jury, "Here are 3 definitions, take your pick." Criminal endangerment requires that the conduct "create" a substantial risk. "Create" means to cause to exist, give rise to or produce. THE AMERICAN HERITAGE DICTIONARY OF

20

THE ENGLISH LANGUAGE, 438 (3d ed. 1992). In other words, create means to "result in." The conduct in question must "create" or "result in" a risk. A jury instruction (definition #1) which focuses solely on conduct rather than conduct and result, simply does not apply to this offense.

_____
Justice

Justice Karla M. Gray joins in the foregoing special concurrence.

_____
Justice

21

Justice James C. Nelson dissenting.

I would hold that the District Court properly instructed the jury as to the mental state element for the offense of criminal endangerment, and, accordingly, I would affirm.

Section 45-5-207, MCA,[1] provides in pertinent part:

> (1) A person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment. This conduct includes but is not limited to knowingly placing in a tree, log, or any other wood any steel, iron, ceramic, or other substance for the purpose of damaging a saw or other wood harvesting, processing, or manufacturing equipment.

In interpreting a statute, we must first look to the words used and, if the language and meaning are plain, unambiguous, direct and certain, we simply ascertain and declare what is in terms or in substance contained therein, neither inserting what has been omitted nor omitting what has been inserted. See § 1-2-101, MCA; State v. Gould (1995), 273 Mont. 207, 219, 902 P.2d 532, 540 (citing State v. Christensen (1994), 265 Mont. 374, 376, 877 P.2d 468, 469 and Clarke v. Massey (1995), 271 Mont. 412, 416, 897 P.2d 1085, 1088.)

While the majority holds that § 45-5-207(1), MCA, defines the mental state element of the offense of criminal endangerment, and, hence, the State's burden of proof, in terms of the result of conduct, I conclude that, to the contrary, the plain language of the statute clearly and unambiguously requires that the State

_____

[1]Unless otherwise stated, the 1993 version of the Montana Code is cited herein as that was the version in effect when Lambert committed the offenses with which he was charged.

22

simply prove that the defendant knowingly engaged in risk-creating conduct, without the necessity of also proving his or her knowledge of the probability that this conduct would cause a result. Moreover, I believe that our prior case law mandates this interpretation of the statute and does not at all support the majority's view.

The operative language in the statute is "knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another. ." The language chosen by the legislature makes unlawful a particular form of conduct--i.e., that which creates a substantial risk of death or serious bodily injury in another. Whether this conduct actually causes the result--death or serious bodily injury--is immaterial. The term "knowingly" modifies the term "conduct" and specifies the mental state required of the defendant during the time that he or she engages in this conduct if it is to be chargeable as the offense of criminal endangerment. It is the conduct which must create the risk, and it is knowledge of or awareness of this conduct that makes engaging in such conduct a criminal offense. So long as the defendant "knowingly" engages in the conduct and so long as that conduct is risk-creating, then, under the statute, it is irrelevant that the defendant also "know" or be aware that death or serious bodily injury will or will likely be caused by that conduct.

In short, there is nothing in the plain language of the statute that supports the majority's interpretation. Rather, the **majority** has **effectively** rearranged the wording of § 45-5-207(1),

**23**

MCA, and, hence, its statutory elements. To support the majority's conclusion, the statute would have to provide: "A person who engages in conduct knowing that it creates a substantial risk . . ." or "A person who knowingly causes a substantial risk . . . ." That is not how the statute is written, however. Rather, the mental state element of criminal endangerment focuses on the defendant's knowledge of his or her risk-creating conduct and not on his or her knowledge of the result of such conduct.

Consequently, so long as the State demonstrated that Lambert's conduct was risk-creating and so long as the State proved that he "knowingly" engaged in this conduct then the State met its burden of proof and Lambert was properly convicted of criminal endangerment. In making this determination, it is first necessary to focus on the conduct at issue.

In this case, the conduct in which Lambert engaged and which created a substantial risk of death or serious bodily injury to others was his driving while grossly intoxicated into the oncoming lane of traffic while his driving privileges were revoked. Neither causation nor result--his causing a serious automobile accident resulting in personal injuries to other persons--are elements of the offense of criminal endangerment; rather it is his risk-creating conduct which the legislature proscribed.

For this risk-creating conduct to be chargeable as the offense of criminal endangerment, however, the statute also requires that it must be engaged in "knowingly." Generally, this mental state can be proven in alternative ways under Montana's criminal code:

24

> **[A] person acts knowingly with respect to conduct or to**
> a circumstance described by a statute defining an offense
> **when the person is aware of the person's own conduct or**
> that the circumstance exists. A person acts knowingly
> with respect to the result of conduct described by a
> statute defining an offense when the person is aware that
> it is highly probable that the result will be caused by
> the person's conduct. When knowledge of the existence of
> a particular fact is an element of an offense, knowledge
> is established if a person is aware of a high probability
> of its existence. [Emphasis added.1

Section 45-2-101(33), MCA.

In this case, the trial court instructed the jury on this mental state element as follows:

A person acts knowingly:

> **(1) when he is aware of his conduct or**

> (2) when he is aware under the circumstances that his conduct constitutes a crime or

> (3) when he is aware there exists the high probability that his conduct will cause a specific result.

Court's Instruction No. 12 (emphasis added).

Lambert objects only to definition (1), apparently conceding the applicability of definitions (2) and (3). The correctness of that concession aside, it is clear that definition (1) from Instruction No. 12 is included within the statutory definition of § 45-2-101(33), MCA, and based upon the statutory definition of criminal endangerment it is also clear that definition (1) is the mental state element applicable to this offense.

As pointed out above, the "conduct" proscribed by the statute defining criminal endangerment is that which "creates a substantial risk of death or serious bodily injury to another." Section 45-5-207(1), MCA. The State is required to prove that the defendant

25

engaged in this conduct "knowingly." It does that under § 45-2-101(33), MCA, by demonstrating that the defendant was "aware of his conduct"--i.e., that the defendant was aware that he was conducting himself in such a fashion so as to create a substantial risk of death or serious bodily injury in another.

While a person's state of mind can rarely be proven by direct evidence, the existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense, § 45-2-103(3), MCA, and may be demonstrated circumstantially. State v. Brogan (1993), 261 Mont. 79, 89, 862 P.2d 19, 25-26.

The evidence here was that Lambert drank to the point of being heavily intoxicated and that, with his driving privileges revoked, he, nonetheless, drove his vehicle from the bar parking lot into the oncoming lane of traffic and collided with the Petersen automobile. At the accident scene, to the police, emergency responders and everyone else present, Lambert gave every appearance and physical manifestation of being grossly intoxicated; he was belligerent; he refused medical treatment; he was unconcerned about the carnage he had caused; he acted inappropriately in view of the seriousness of the situation; and there were full and empty bottles of beer in his car along with a partially consumed bottle of whiskey.

Lambert was obviously aware that he had been drinking--he indicated that to the investigating officer, although he minimized the amount he had drunk. Moreover, he was obviously aware that he

26

was driving--he first stated that he did not see the Peterson car and then attempted to lay fault on Christine Petersen. When asked what happened, Lambert said:

> Pulled up, turned out, and they were right there. I thought they were going the other way. They were there just like right now, so either I didn't see them, or they were going way too fast.

Under such circumstances any rational trier of fact could have, and likely would have, concluded that Lambert was "aware of his conduct"--i.e., that his conduct was such to create a substantial risk of death or serious bodily injury to another--and that he, therefore, acted "knowingly." It was irrelevant that Lambert may not have intended to cause the accident or that he even intended to put any one in general or in particular at risk. It was sufficient that his conduct--driving blind drunk into oncoming traffic--was risk-creating and that he was aware of what he was doing when he engaged in that conduct.

This interpretation is fully supported by and consistent with our prior case law which, for the most part, is virtually ignored by the majority.

In State v. Clawson (1989), 239 Mont. 413, 781 P.2d 267, we stated that "it is clear that the *statute is created to punish* reckless or negligent *behavior* which has the *inherent potential* of resulting in death or serious bodily injury to another person." Clawson, 781 P.2d at 272 (emphasis added).

Moreover, in State v. Crisp (1991), 249 Mont. 199, 814 P.2d 981, we pointed out that the statute "does not require that the victim suffer actual physical injury . . . [but rather] [i]t

*27*

requires only that the defendant engage in *conduct* that creates a substantial risk of death or serious bodily injury.11  <u>Crisp</u>, 814 P.2d at 904.  Unfortunately, in addressing the primary issue in <u>Crisp</u>--the constitutionality of the criminal endangerment statute-- and with no real analysis of the ordering of language defining that offense, we erroneously misstated which definition of "knowingly" is applicable in discussing the mental state element.  Unlike the majority, I would take this opportunity to clarify <u>Crisp</u> rather than perpetuate that error.

In State v. Willson (1991), 250 Mont. 241, 818 P.2d 1199, we affirmed the defendant's conviction of criminal endangerment and his designation as a dangerous offender where he drove through downtown Billings at speeds up to 100 miles per hour while under the influence of crank and cocaine, with resulting property damage and personal injury to innocent people.  <u>Willson</u>, *818* P.2d at 1203.

Likewise, in State v. Brown (1995), 270 Mont. 454, 893 P.2d *320,* we rejected the notion that either criminal endangerment or negligent endangerment (§ 45-5-208, MCA) required the State to prove that any specifically identified individual was put at risk by the defendant's conduct in firing several gunshots from a moving vehicle in the direction of homes and vehicles along the highway.

Similarly, in State v. Smaage (1996), 276 Mont. 94, 915 P.2d 192, we affirmed a conviction of criminal endangerment where, having been previously convicted of six DUIs (one of which resulted

in a death and negligent homicide conviction)[2] and with a blood alcohol level of .250, the defendant swerved his Buick through early morning Helena traffic. We concluded that Smaage knowingly engaged in conduct that created a substantial risk of death or serious bodily injury to others. Smaage, 915 P.2d at 195.

Finally, and most recently, in State v. Bell (Mont. 1996), 923 P.2d 524, 53 St.Rep. 792, we upheld the defendant's conviction of criminal endangerment where he entered his pickup and then accelerated and sped away while a deputy sheriff had one hand on Bell's arm and the other on the truck's open door and where the defendant then drove at speeds of between 50 and 80 miles per hour through Hardin streets with the authorities in pursuit

In Bell we cited the language of the statute itself, its legislative history and our decisions in Smaage and Brown in concluding that the defendant's *knowing conduct creating a* substantial *risk* of death or serious bodily injury to another-- rather than the result of that conduct--was what violated the law. Referring to the "tree spiking" language of § 45-5-207, MCA, and likening that to driving 80 miles per hour down a city street, we

---

[2] By comparison, Smaage's record pales in the face of Lambert's criminal history. According to the presentence investigation report, Lambert, at 31 years of age, had been convicted of driving under the influence 9 times in Montana and California; his license had been suspended or revoked 16 times; he had been charged with driving while his license was suspended or revoked some 20 times; he had received 11 separate jail sentences that ranged from serving two days in jail to serving 60 days in jail; he had been fined between $30 and $1000 for his offenses; he had failed to complete court-ordered after-care or Alcoholics Anonymous; and, while released on bond in the instant case, he was again arrested for DTJI, driving while his license was suspended or revoked and eluding a peace officer.

29

stated:

> In a prosecution for spiking trees, it is sufficient that the State prove that the spike was "placed" for the purpose of damaging a saw. It is not necessary that the State prove that the tree was actually sawed or that an identifiable person was endangered or injured by the spike. Additionally, the criminal endangerment statute does not require proof that the defendant intended to injure another. Rather, <u>it requires that the State prove that the defendant "knowingly" engaged in conduct and that the conduct created a *substantial risk* of death or serious bodily injury to another.</u> [Emphasis added.]

*Bell*, 923 P.2d at 526.

We went on to cite <u>Brown</u> and its discussion of the legislative history of criminal endangerment, noting that it was the legislature's intent "to 'plug a hole in the criminal law' and *address conduct* such as placing poison into aspirin in a store." <u>Bell</u>, 923 P.2d at 527 (emphasis added) (citing <u>Brown,</u> 893 P.2d at 322).

We concluded with the following:

> Although Bell may have had *no intent to injure anyone, he knowingly drove down a city street at up to 80 mph. The* fortuitous *circumstance that he did not actually harm anyone or have any near misses is* irrelevant. His driving down a city street at excessive speed created a risk of death or serious bodily injury to unnamed, unidentified people. .
>
> . .
>
> [W]e hold that *where a person drives a car at speeds up to 80 mph through occupied city streets, ignoring traffic signs, in the middle of the morning, that person creates a substantial risk of death or serious bodily injury to another*, thus committing the offense of criminal endangerment. [Emphasis added.]

*Bell*, 923 P.2d at 528.

While the majority reads the criminal endangerment statute as emphasizing result over conduct, our prior decisions, to the case,

support precisely the opposite conclusion. In each case we have focused *on conduct* which *creates* a substantial *risk* as that which is proscribed by a statute. The result of that conduct was wholly irrelevant in our prior decisions. It was irrelevant that no particular victim was identified as being put at risk by the conduct at issue; it was irrelevant that no one was actually injured by the conduct at issue. Rather, we focused entirely on the risk-creating nature of each defendant's conduct.

Whether the conduct at issue is spiking a tree, poisoning a bottle of aspirin, firing a gun in the general direction of houses and vehicles, driving at an excessively high rate of speed through occupied streets, or driving while grossly intoxicated, we have uniformly and consistently focused on the perpetrator's risk-creating conduct only and not on whether he was aware that his conduct would cause any particular result.

Contrary to the majority's suggestion, criminal endangerment does not arise in situations where one is simply "driving a car" or "shooting a hunting rifle." Rather, it arises where the conduct at issue involves driving a car, blind drunk, into oncoming traffic or driving a car at a high speed through occupied city streets with the police in hot pursuit or shooting a hunting rifle in the direction of homes and vehicles. If the defendant is aware that he is engaging in that sort of risk-creating conduct, then he is acting knowingly and whether he is also aware of the result or potential result of his conduct is irrelevant. When I fire my rifle into a moving train, or, while dead drunk, I drive my car

*31*

into oncoming traffic, all the time being aware of my conduct in doing those activities, then I have acted knowingly. My protestations that I wasn't aware that anyone would be hurt or killed is meaningless.

Having set forth what is, I believe, the correct analysis of the applicable law, I next address Justice Leaphart's special concurrence. First, the author criticizes the District Judge for instructing the jury utilizing various definitions of "knowingly." In point of fact, the judge instructed the jury in accordance with the statute defining the mental state, only one portion of which was objected to by Lambert; the defendant, himself, agreed with two-thirds of the "smorgasbord."

Next Justice Leaphart tries to make sense out of the majority holding by using an example involving issuing a bad check. He then goes on to claim that the dissent contends that the mental state element for issuing a bad check and for criminal endangerment are similar. The concurring Justice is wrong on both counts. The dissent did not and does not make that contention. Moreover, the dissent strongly disagrees that Justice Leaphart has articulated the correct mental state element for issuing a bad check in his example.

A person simply aware that he is issuing or delivering a check--i.e., a person who is "aware of his conduct" (subsection (1) of the court's instruction) has not the mental state required for commission of the criminal offense. Again, focusing on the actual ordering of the language of the statute, the person must issue or

32

deliver the check "knowing that it will not be paid by the depository." In other words he must not only be aware of his conduct (issuing or delivering the check), but he must also be aware that under the circumstances his conduct constitutes a crime or will cause a specific result--i.e., that the check will not be paid by the depository (subsections (2) and (3) of the court's instruction).

Unlike the offense of criminal endangerment wherein "knowingly" modifies the term conduct, in the offense of issuing a bad check, "knowing" modifies the result. Contrary to the special concurrence, the result proscribed by the statute is not that the check was issued or delivered (that is simply conduct) or that anyone is defrauded (that is not even an element of the offense). The prohibited result of issuing or delivering the check is that the check will not be paid by the depository. If one issues or delivers a check knowing that will be the result, then the offense is committed.

The special concurrence then goes on to state that in Smaage, the State had to prove that the defendant "was aware that there was a high probability that his driving, under [the facts of the case], created a specific result, that is, a substantial risk of death or serious bodily injury." Justice Leaphart misquotes our opinion. In Smaage, we referred to the mental state element of the offense as follows:

> The elements of criminal endangerment are the mental state of "knowingly" and *the act* of engaging in conduct that creates a substantial risk of death or serious bodily injury to another. A person commits the offense

of criminal endangerment when he is **aware that there is** a high probability that his conduct may cause a substantial risk of death or serious bodily injury to another. State v. Crisp (1991), 249 Mont. 199, 203, 814 P.2d 981, 983. [Emphasis added.]

Smaage, 915 P.2d at 195. We then went on to describe the trial court's quoting with approval comments from Smaage's prior negligent homicide sentencing regarding his extensive criminal history involving DUI, and stated:

The above comments by the District Court outline the evidence in the record supporting a finding that Smaage acted "knowingly." The presence of other people on the streets down which Smaage weaved the Buick--a potential lethal missile in the hands of a driver with a .250 blood alcohol content--supports a finding that Smaage engaged in conduct creating a substantial risk of death or serious bodily injury to another.

Smaage, 915 P.2d at 195.

At no point in Smaage did we hold or even imply that the defendant had to be aware of a specific result of his conduct to be convicted of criminal endangerment. To the contrary, the language quoted above states that Smaage was properly convicted because he "knowingly" engaged in risk-creating conduct.

While Justice Leaphart criticizes the dissent for "see[ing] the risk factor as being part and parcel of the conduct, rather than a 'result' of the conduct," that is precisely how the Legislature has chosen to define the offense of criminal endangerment--*conduct that creates a substantial risk of death or serious bodily injury to another. . . ." The result of conduct is not proscribed; rather, a specific sort of conduct itself is prohibited. If the Legislature wanted to prohibit the result of the conduct--e.g., engaging in conduct, knowing that it creates a

34

substantial risk, etc.,--the Legislature could have and would have used different language than it did.

Finally, Justice Leaphart uses the example of the three shooters. Jones fires in the direction where there is nothing but an open field. He is aware that he is engaging in conduct that is not causing a substantial risk of death or serious bodily injury to another. Obviously, Jones is not criminally endangering anyone.

Smith fires in the direction of a grove of trees, wherein, unbeknownst to him, there is located a house. Justice Leaphart concludes that under subsection (1) of the court's instruction, Smith could be charged with criminal endangerment since he was aware of his conduct. I suggest that such a conclusion depends necessarily on facts which are not set out in his example. If the grove of trees is located in the Bob Marshall Wilderness, a jury might well conclude that Smith's conduct was not risk-creating at all. I.e., in the words of the statute, shooting into a grove of trees in the Bob was not conduct that "create[d] a substantial risk of death or serious bodily injury. . . ." Accordingly, being aware that one was engaging in that conduct would not be criminally chargeable because the conduct was not proscribed by the statute. On the other hand, if the grove of trees was located in a residential development adjacent to the field, then a jury might well conclude that, under those circumstances, shooting into the trees was risk-creating conduct. Being aware that one was engaging in *that* conduct would be chargeable.

Johnson fires toward a cluster of houses in plain view.

Obviously Johnson is aware that his conduct is risk-creating. He can be charged with and convicted of criminal endangerment.

Again the focus of criminal endangerment is on the conduct--was it risk-creating or not? The State must prove that the conduct was risk-creating--i.e., that the conduct creates a substantial risk of death or serious bodily to another--and that the defendant was aware he was engaging in that conduct. Under the language chosen by the Legislature, the State does not have to prove that the defendant was aware of any specific result.

Justice Leaphart's suggestion that proof of knowledge based on subsection (1) of the court's instruction would render negligent endangerment (§ 45-5-208, MCA) and criminal endangerment indistinguishable is an issue not raised in this case. Moreover, this suggestion is likely incorrect in any event, given that the mental state of "negligently" is specifically defined in terms of result instead of conduct. Section 45-2-101(42), MCA.

Furthermore, contrary to the special concurrence, the issue in this case was not a claim of error in giving the jury the option of picking and choosing definitions of the mental state element of the crime charged. The issue involves an instruction that gave the jury three statutory definitions of the mental state element, two of which the parties and the court agreed to and one of which was objectionable to Lambert. The defendant had no problem with the "smorgasbord;" he merely did not like one of the entrees.

Finally, in regard to Justice Trieweiler's special concurrence, suffice it to say that I agree with neither his

**36**

analysis nor with the outcome of the factual scenarios he has chosen to use as examples--none of which even remotely approximate the facts presented to the jury in this case. I find it interesting, however, that he concedes, as he must, that while "in this case there was obviously evidence that Lambert was aware that his conduct would create a substantial risk of harm," in the next sentence he concludes that the jury might not have reached this same "obvious" conclusion because of an instruction which allowed them to determine Lambert's mental state if they were convinced that he was aware that he was engaging in this very risk-creating conduct. It is instructive, indeed, to learn that while judges are capable of discerning the obvious, men and women who serve on our trial juries, apparently, are not. Our collective agonizing over the definition of mental states aside, I suspect that the next jury will be in no better position to divine what was going on in Lambert's drunken mind with the new instruction than the present jury was with the instruction given by the court. Fortunately, the next panel will likely still be able to discern the "obvious", regardless.

In failing to properly analyze the mental state element of criminal endangerment within the context of the actual language of the statute and our prior case law, the majority has come to the wrong conclusion. The trial court's instruction that Lambert acted knowingly if he was "aware of his conduct" was correct.

I would affirm, and I dissent from our failure to do so.

_____
                        Justice

37

Chief Justice J.A. Turnage and Justice Charles E. Erdmann join in the foregoing dissent.

_____
Chief Justice

_____
Justice

38

Chief Justice J. A. Turnage, dissenting:

I concur with the dissent of Justice James C. Nelson and emphasize that Justice Nelson's dissent is absolutely correct as a matter of law and in keeping with this Court's precedents.

On August 20, 1994, at approximately 10:OO a.m. Christine Peterson drove her Jeep Cherokee from her home in Darby, Montana, to Missoula, Montana. Riding with her were her three school-aged children and Mary Nelson, a seventh grader and friend of her daughter. The purpose of the trip to Missoula was school shopping for the children.

At approximately 5:30 p.m., Christine Peterson and her passengers were traveling from Missoula on the return trip to their home in Darby. For Christine Peterson and the children, traveling south on Highway 93 at approximately 6:00 p.m. and at a point near Stevensville, Montana, all hell broke loose.

Christine Peterson was driving safely in her southbound lane of Highway 93 at a speed well within the speed limit when David B. Lambert, defendant and appellant in this cause, drove his Monte Carlo vehicle from the parking area of the Fort Owen Inn saloon, onto Highway 93, crossing into the southbound lane occupied by the Peterson vehicle and smashing head-on into her vehicle. Lambert's actions caused a substantial risk of death and caused serious bodily injury to Christine and her passengers.

At the scene Highway Patrol Officer Thomas Hamilton described Lambert's condition when he drove his vehicle head-on into the Peterson vehicle in this manner:

. . . He was--I have always referred to it as pie faced. He didn't seem to be in physical control of his muscles

39

and whatnot. He was slouched. His speech was slurred. He was leaning. He wasn't standing erect. Just his physical appearance struck me as someone under the influence of alcohol.

Lambert's person had an odor of alcohol and he failed field sobriety tests at the scene. When taken to the sheriff's office at Hamilton, he refused to cooperate in any other sobriety tests and also refused to give a breath test for alcohol content in his body. At the scene, Officer Hamilton found in Lambert's vehicle a bottle of Black Velvet whiskey approximately three-fourths full and both empty and full bottles of beer.

After Lambert's trial for felony criminal endangerment, a jury found him guilty of that charge.

At sentencing, Lambert's criminal history for driving motor vehicles was reviewed by the District Court. This record is an eye popper.

For the period June 11, 1983, to November 28, 1994, Lambert's criminal history record discloses that, at the time of sentencing in this case, he had been convicted thirty-eight times of serious driving offenses and that nine charges of serious driving offenses were still pending.

Nine of the serious convictions were for driving under the influence of alcohol or drunken driving. Three of the charges still pending at the time of sentencing were for driving under the influence of alcohol or drunken driving. The last such charge still pending is alleged to have been committed while Lambert was released on bail for the felony criminal endangerment charge and the pending driving under the influence of alcohol charge of August 20, 1994.

Lambert's driver's license has also been suspended on two occasions when he refused to take a chemical test for alcohol in his body.

Between May 23, 1987, and August 20, 1994, Lambert had been convicted seven times of driving a motor vehicle while his license was suspended or revoked and, at the time of sentencing in this case, he had pled guilty to driving a motor vehicle while his license was suspended or revoked on August 20, 1994. Three other charges against Lambert of driving while his license was suspended or revoked apparently are still pending.

Mary Nelson, a seventh grader and one of the victims in the crash, has said it all when she stated, "I feel that when David gets out of jail, it's not a matter of if he kills someone, but when."

The majority of this Court is reversing the felony criminal endangerment conviction of Lambert essentially because of their holding that the District Court misled the jury in giving court's instruction no. 12. The majority's opinion is not correct as a matter of law, as clearly pointed out by Justice Nelson's dissent. Further, the majority opinion is not correct as a matter of common sense.

Section 45-5-207, MCA, the statute under which Lambert was charged and properly convicted of felony criminal endangerment, insofar as pertinent to this case, provides:

> (1) A person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment.

41

Instruction no. 12 given to the jury stated:

A person acts knowingly:

(1) when he is aware of his conduct or

(2) when is aware under the circumstances that his conduct constitutes a crime or

(3) when he is aware there exists the high probability that his conduct will cause a specific result.

The statute is clear, and the instruction is clear. The jury simply could not have been misled. Lambert acted knowingly under any of the three definitions in instruction no. 12. Lambert in all probability has had more experience as a drunken driver than anyone in Montana--he knew what he was doing and was aware of his conduct on August 20, 1994, when he drove under the influence of alcohol.

The Bench and Bar are well aware that the rule of law, a basis of stability in our society, is dependent upon public confidence in our courts and justice system. In its legal arabesque, pirouette, and struggle to reverse Lambert's conviction, the majority in this case will, I believe, undermine public confidence in the court and justice system of Montana. Decisions such as this leave no doubt why MADD is angry.

I would affirm the District Court.

_____
Chief Justice

Justice Charles E. Erdmann concurs in the dissent of Chief Justice Turnage.

_____
Justice

42