No. 96-470

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

Plaintiff and Respondent,

v.

BILL GENE THOMAS,

Defendant and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Stillwater,
The Honorable Russell C. Fagg, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

Vernon E. Woodward, Hendrickson, Everson, Noenning and
Woodward, Billings, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; Mark C. Fowler,
Assistant Attorney General, Helena, Montana

Robert Eddleman, County Attorney, Columbus, Montana

Submitted on Briefs: July 23, 1997

Decided: October 16,1997
Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Bill Gene Thomas pled guilty to deliberate homicide. He appeals the denial of his petition for postconviction relief by the Thirteenth Judicial District Court, Stillwater County. We affirm.

The issues are whether Thomas was denied effective assistance of counsel and whether his plea of guilty was knowingly and voluntarily made.

On January 23, 1993, the body of Donald Verly was found lying face down in a pile of dirt and snow on his ranch north of Rapelje, Montana. Verly had been shot twice, once in the chest and once under his left eye.

Verly's Dodge pickup truck was missing from his ranch. Within days, investigating officers located the vehicle in a motel parking lot in Billings, Montana. The motel manager told the officers that a Bill Thomas had been registered in Room 7 at the motel for about a week. In December 1992, the Stillwater County Sheriff had removed ranch hand Bill Thomas from Verly's ranch after Verly complained that Thomas had threatened to kill him.

Billings police also received a Crimestopper's report that Thomas had tried to sell the informant two rifles and a .357 magnum pistol, stating that the owner would not be needing them because "he had a major coronary." At the Verly ranch, authorities recovered empty boxes for a Remington rifle and a .357 magnum pistol.

Thomas was arrested. In his possession, Billings police found a bank cash card belonging to Verly. In the Dodge pickup, they found ammunition, a loaded Remington rifle, and a bag labeled with Thomas's name containing burglary tools. They also recovered, from the home of Thomas's acquaintance, another rifle and a .357 magnum pistol which the acquaintance said Thomas had left there. Weapons records from the federal Bureau of Alcohol, Tobacco, and Firearms confirmed that Verly had purchased the .357 magnum pistol and one of the rifles in December 1992.

Carol Lynne Bear Cub, a friend of Thomas, gave Stillwater County authorities a detailed statement. She reported that she and Keith Fuller had given Thomas a ride out of Billings on the evening of January 19, 1993, so that the two men could burglarize a ranch. According to Bear Cub, Thomas had a gun with him. After they completed the burglary at about 2 a.m., Bear Cub and Fuller left the ranch to drive back to Billings.

Thomas left on foot to, as Bear Cub understood, walk five or six miles in the cold snowy night to another ranch for the purpose of having a "little talk" with his "friend."

Bear Cub further related that Thomas showed up at her apartment in Billings the next day in an ugly, dented Dodge truck. She said he told her that he had committed a homicide because he had to "pay the guy back for being a bastard" and "take him out of his own misery." Thomas had previously complained to Bear Cub about a former ranch

employer who owed him money, and Bear Cub understood that the rancher was the victim of the homicide. According to Bear Cub, Thomas told her that he waited for the rancher to come out the door of his house in the morning and, when he did, shot him "through the heart." Then he walked up to the rancher as he lay on the ground and shot him in the eye. Thomas told Bear Cub that he put the body where it would not be found for awhile.

On February 1, 1993, the District Court appointed John Mohr to represent Thomas. Mohr read the police reports and the autopsy report. Thomas admitted to Mohr that he had killed Verly, shooting him first in the chest, and then, as Verly lay on the ground, shooting him again in the eye. Thomas gave Mohr essentially the same facts of the crime as Bear Cub had relayed, which were also consistent with the police reports. Thomas told Mohr that he first disposed of Verlyþs body in a shed but that he later returned to the ranch and used a tractor to move the body to the spot where it was eventually discovered. Thomas also told Mohr that after he killed Verly and again on his return trip to the ranch, he stole items belonging to Verly to cover a $300 debt Verly owed him.

The State advised Mohr that it would seek imposition of the death penalty based on the aggravating factor of lying in wait for the victim, under õ 46-18-303(4), MCA. Alternatively, the State advised Mohr that it would seek a term of life imprisonment without parole.

On March 10, 1993, on Mohr's advice, Thomas pled guilty to deliberate homicide. The State recommended that Thomas be sentenced to 100 years in the Montana State Prison with ten additional years for use of a dangerous weapon. At sentencing, the District Court added a special restriction making Thomas ineligible for parole for thirty years.

Five months later, Thomas filed with the District Court a pro se petition for post-conviction relief and moved for appointment of new defense counsel. The new attorney appointed to represent him filed an amended petition for postconviction relief alleging that Thomas's plea was involuntary because he had not been advised of the possibility of a parole restriction and because Mohr rendered him ineffective assistance of counsel. The amended petition claimed that Mohr did not independently or adequately investigate the facts of the case or imposition of the death penalty and did not properly advise Thomas regarding the death penalty, parole restrictions, or mitigating factors.

Mohr and Thomas both testified at the hearing on the amended petition for post-conviction relief. Sandy Selvey, a Yellowstone County public defender, testified as an expert on behalf of Thomas. Gary Wilcox, another Yellowstone County public defender,

testified as an expert on behalf of the State.  Following the hearing, the court entered detailed findings and conclusions and a judgment denying Thomas postconviction relief.

## Issue 1

### Was Thomas denied effective assistance of counsel?

This Court's general standard of review of a district court's denial of postconviction relief is whether substantial evidence supports the district court's findings and whether the court's conclusions of law are correct.  Brown v. State (1996), 277 Mont. 430, 434, 922 P.2d 1146, 1148.

Both the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee a criminal defendant the right to assistance of counsel for the person's defense.  As  in other cases involving issues of ineffective assistance of counsel, we use a two-pronged standard of review in cases which have resulted in guilty pleas:  whether counsel's performance fell within the range of competence reasonably demanded in light of the Sixth Amendment, and, if not, whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  See State v. Mahoney (1994), 264 Mont. 89, 101, 870 P.2d 65, 72-73.

On appeal, Thomas argues that he was denied effective assistance of counsel in several respects.  Mohr met with him only four times before the guilty plea.   Thomas maintains that Mohr did not investigate the case adequately in that he did not conduct an independent investigation (did not hire an investigator; did not travel to the crime scene; did not speak to Bear Cub, but only read the statement she gave to the police).  Thomas also contends that Mohr should have investigated whether his mental condition represented a mitigating circumstance as to the death penalty.

Although Thomas points out that this was the first deliberate homicide case Mohr had ever defended, Mohr had been licensed to practice law in Montana for over fifteen years when he was appointed to represent Thomas.  He had handled the majority of the criminal defense work for the City of Laurel, the City of Columbus, and Stillwater County for almost ten years.  Mohr estimated that he defended approximately fifty criminal cases each year, with about half of those being felonies.

The standard for determining a criminal defense counsel's duty to investigate was described in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed.2d 674:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a

defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. Strickland, 466 U.S. at 691.

In this case, the chief evidence supportive of a self-defense theory was Thomas's own statement that Verly carried a gun when he came out of his house on the morning he was killed. Thomas had not related this to Bear Cub. Nor was any corroboration available for this statement, because Thomas had moved the body and no gun had been found with it. Moreover, Mohr noticed that each time Thomas described the events, "you would see this anger and sort of aggression about Mr. Verly." Mohr testified that he was concerned that Thomas would appear aggressive if he testified, and that he felt Thomas's own testimony would be detrimental to a self-defense case.

The evidence contradicting a self-defense theory, on the other hand, was formidable. According to Thomas's own statement, when he shot Verly the second time Verly was lying on the ground immobilized from the first shot. Thomas did not attempt to contact authorities after the shooting, as would be consistent with a shooting in self-defense. Instead, by his own admission, he smoked a cigarette, burglarized Verly's home, and then stole Verly's truck and left the ranch. Thomas admitted that he and his friend Fuller later returned to the ranch and burglarized the house a second time, when Thomas also moved and tried to conceal Verly's body.

Mohr testified that he recognized that Verly's character would be important if it could have been considered a contributing factor to the homicide. Some witness statements he reviewed indicated that Verly was eccentric and had mood swings. However, in light of Thomas's own admission that he went onto Verly's property during the night and waited outside Verly's house with a gun until Verly came out in the morning, Mohr did not believe that Verly's character could be considered a direct cause of the homicide.

Mohr testified that he had reviewed the statutes relating to mitigated deliberate homicide and was aware of the defendant's burden, in establishing mitigation, to show that he was under the influence of extreme mental or emotional distress. Mohr knew that Thomas was angry with Verly for failing to pay him $300 in wages. He did not believe, however, that a jury would agree with a mental or emotional distress defense based on that factor, especially when Thomas went to Verly's house and waited for him to come out.

Mohr testified that prior to bringing the plea proposal to Thomas's attention, he felt there were "[n]o holes to be filled with any investigation." Thomas's statements to Mohr concerning the crime had been consistent with the discovery material and witness statements. Mohr interviewed several witnesses, such as a person who had helped

Thomas out of the ditch as he drove Verly's truck away from the crime scene. The court had allowed Bear Cub's deposition to be taken, which could have been used at trial if Bear Cub was not present, or to rebut her testimony at trial if it was different from her initial statements. Mohr believed he had all the facts pertinent to handle the case.

Thomas did not ask Mohr to investigate any other issues or to hire an investigator. Defense counsel's duty is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A decision not to investigate must be assessed for reasonableness in light of all of the circumstances of the case, "applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.

Thomas suggests that Mohr was drastically ineffective in not personally interviewing Bear Cub. However, Thomas himself confirmed that the substance of Bear Cub's statement was essentially correct. His main quarrel with Bear Cub's statement was that he had told Fuller, not Bear Cub, about the homicide; he claimed he had not personally discussed the homicide with Bear Cub. Thomas nonetheless admitted that the substance of what he told Fuller was the same as the story related by Bear Cub. "A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." United States v. Decoster (D.C. Cir. 1976), 624 F.2d 196, 209. Here, Mohr had reviewed the written statements of Fuller, Bear Cub, and all other potential witnesses. Thomas himself had confirmed the accuracy of these reports. There is no indication that there were any witnesses who could have provided exculpatory information. There is no indication that a personal interview of Bear Cub was necessary to effective representation of Thomas.

Mohr testified that he did not request a psychological evaluation of Thomas because of Thomas's vehement objections to the idea and his own observations of Thomas, which led him to believe that Thomas was not suffering from a mental disease or defect. Nothing of record in Thomas's history or demeanor indicates that he suffered from a mental disease or defect at the time of the crime. Based on his answers to Mohr's inquiries, Thomas was not interested in pursuing such a defense. Mohr's decision not to request a mental examination of Thomas is supported by the absence of evidence in the record to support a theory of mental disease or defect. See State v. Long (1986), 223 Mont. 502, 726 P.2d 1364.

Thomas further contended that he would not have signed the plea agreement had Mohr not "badgered" him into doing so. The court found that Thomas's testimony that Mohr pressured him into signing the plea agreement was not credible. Thomas admitted that he never asked for a change of counsel. He acknowledged satisfaction with

Mohr's services twice in writing, and orally in response to the court's inquiry at the change of plea hearing.

Determinations of credibility of witnesses are within the province of the finder of fact. State v. Ahmed (1996), 278 Mont. 200, 212, 924 P.2d 679, 686, cert. denied, 117 S.Ct. 748 (1997). The District Court found Mohr's testimony at the hearing on the post-conviction relief petition credible and Thomas's testimony incredible. Thomas contradicted himself in several respects. For example, he testified that he had believed the plea agreement was completely binding on not only himself, but also on the court. This testimony contradicted the signed provisions of the plea agreement. It was also contrary to Thomas's oral statements on this subject at the plea hearing, when he told the court that he understood that the court could still impose whatever sentence it felt was appropriate.

Mohr certified that he left the ultimate decision on whether to go to trial up to Thomas. He testified that Thomas agreed to the plea agreement, telling Mohr that he had committed the crime and just wanted to start serving his time. Mohr further testified that Thomas explained he did not think he would live another seventeen years (the minimum time to be served under the plea agreement), because heart problems ran in his family.

The State's expert, Wilcox, testified that under the circumstances it was reasonable for Mohr to conclude that no psychological evaluation of Thomas was warranted, that Thomas was able to assist in his own defense, and that he was capable of forming the requisite mental state for the offense charged. Wilcox also opined that Mohr's representation of Thomas was adequate.

After reviewing the extensive evidence presented to the District Court, we conclude that the court did not err in determining that counsel's performance fell within the range of competence reasonably demanded under the Sixth Amendment. The court's comprehensive findings of fact are supported by substantial credible evidence, and its conclusions of law are correct. Because Mohr's representation of Thomas was effective, we do not address whether Thomas suffered prejudice from ineffective representation.

Issue 2

Was Thomas's guilty plea knowingly and voluntarily made?

Thomas maintains that his guilty plea was unknowingly and involuntarily entered because Mohr did not advise him of the possibility that the court might restrict his parole eligibility. Thomas argues that this failure to advise him violated õ 46-12-210(1), MCA,

which requires that before a plea of guilty is accepted, the court must determine that the criminal defendant understands "the maximum penalty provided by law, including the effect of any penalty enhancement provision or special parole restriction." The District Court restricted Thomas's parole pursuant to its authority under õ 46-18-202(2), MCA:

Whenever the district court imposes a sentence of imprisonment in the state prison for a term exceeding 1 year, the court may also impose the restriction that the defendant is ineligible for parole and participation in the supervised release program while serving that term. If the restriction is to be imposed, the court shall state the reasons for it in writing. If the court finds that the restriction is necessary for the protection of society, it shall impose the restriction as part of the sentence and the judgment must contain a statement of the reasons for the restriction.

In its sentencing order, the court set forth as reasons for the parole restriction Thomas's criminal history of felony convictions for burglary, armed robbery, escape and assault, his history of "no demonstrable positive response to community supervision," and that he had spent the larger part of the past seventeen years in prison. The court stated, "It is clear . . . the defendant cannot conform to the norms of society and his release into the community could well lead to recurrent violence which makes the defendant a significant danger to other members of society."

This issue requires an interpretation of the meaning of "special parole restriction" as that phrase is used in õ 46-12-210(1), MCA. In construing a statute, the statute must be read as a whole and its terms must not be isolated from the context in which the legislature has used them. McClanathan v. Smith (1980), 186 Mont. 56, 61, 606 P.2d 507, 510. When the phrase "special parole restriction" is read in the context of õ 46-12-210(1), MCA, as a whole, "the maximum penalty provided by law, including the effect of any penalty enhancement provision or special parole restriction," the phrasing of the statute indicates that the parole restriction must be one that is provided by law, and does not refer to discretionary parole restrictions which the court might impose upon reviewing the presentence investigation. Such a construction is reasonable because, prior to sentencing, and when a district court is not bound by the terms of a parole agreement, it is impossible to know what restrictions the court might impose, other than those specifically defined by statute.

The legislative history of õ 46-12-210, MCA, buttresses this interpretation. The statute was significantly revised in 1991. The Commission Comments concerning that revision state:

This statute is essentially a restatement of Rule 11(c) of the Federal Rules

of Criminal Procedure.  When appropriate, some changes have been made to accommodate Montana statutory and case law decisions.  The statute presents a more concise and coherent approach to the plea colloquy.

Contrary to Thomas's assertions, there is no indication that the Legislature intended to overrule this Court's opinion in State v. Buckman (1989), 236 Mont. 37, 43, 768 P.2d 1361, 1365, that the statutes "do not require the District Court to advise the defendant of any possibility of limitations of his parole eligibility."

Further, the Commission Comment that õ 46-12-210, MCA, is a restatement of Rule 11(c), Fed.R.Crim.P., confirms that the court and attorney are obligated only to inform a defendant of statutorily-defined "special parole restrictions."  The phrase "special parole term" in Rule 11(c), Fed.R.Crim.P., has been uniformly construed to mean a term as defined by law, not "all conceivable consequences such as when [a person] may be considered for parole."  United States v. Sanclemente-Bejarano (9th Cir. 1988), 861 F.2d 206, 209.

In Hill v. Lockhart (1985), 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203, the United States Supreme Court verified that Rule 11(c), Fed.R.Crim.P., does not require advice on parole eligibility.  The Court stated:

We have never held that the United States Constitution requires the State to furnish a defendant with information about parole eligibility in order for the defendant's plea of guilty to be voluntary, and indeed such a constitutional requirement would be inconsistent with the current rules of procedure governing entry of guilty pleas in the federal courts.

Hill, 474 U.S. at 56.

Thomas suggests that the Hill decision on remand indicates that defense counsel bears a duty to inform a criminal defendant of a possible parole restriction in order to have a voluntary and knowing guilty plea.  However, the facts found on remand in Hill are significantly different from the facts in this case.  In Hill, the court found that Hill had explicitly asked his defense counsel about the parole system in Arkansas and had made it clear to his counsel that timing of his parole eligibility was the dispositive issue for him in accepting or rejecting the plea bargain.  Hill v. Lockhart (8th Cir. 1990), 894 F.2d 1009, 1010.  Hill told his attorney he would not accept the plea bargain unless he would be eligible for parole in less than seven years.  The court found that Hill's attorney actually gave Hill incorrect advice which directly affected his decision to plead guilty, by telling him that he would be eligible for parole after serving one-third of his sentence, when Arkansas statutes provided that he must serve one-half of his sentence.  Hill, 894 F.2d at 1010.

In contrast, there is nothing to indicate that Thomas was either misadvised or given

incorrect information regarding Montana's statutory parole requirements. He was made aware that under the proposed plea agreement he would be eligible for parole in seventeen and a half years. The record establishes that Thomas also knew that the District Court was not bound by the terms of the plea agreement. Most importantly, there is nothing of record to indicate that parole eligibility was a concern for Thomas when he agreed to the plea bargain. As Mohr testified, Thomas told him he wanted to plead guilty and begin serving his time. In this situation, Thomas cannot credibly claim that the additional parole restriction would have affected his decision to plead guilty.

Affirmed.

/S/  J. A.  TURNAGE


We concur:


/S/  W. WILLIAM LEAPHART

/S/  WILLIAM E. HUNT, SR.

/S/  JIM REGNIER

/S/  TERRY N. TRIEWEILER