No. 96-574

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 102

299 Mont. 273

2 P. 3d 223

STATE OF MONTANA,

Plaintiff and Respondent,

v.

STACY J. SCHIPMAN,

Defendant and Appellant.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Beaverhead,

The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

**For Appellant:**

Vincent J. Kozakiewicz, Dillon, Montana

**For Respondent:**

Joseph P. Mazurek, Montana Attorney General, Tammy K. Plubell, Assistant Montana

Attorney General, Helena, Montana; Thomas R. Scott, Beaverhead County Attorney, Calvin Erb, Deputy Beaverhead County Attorney, Dillon, Montana

_____

Submitted on Briefs: April 1, 1999

Decided: April 25, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1.Following a trial by jury, Defendant Stacy J. Schipman (Schipman) was convicted of negligent homicide, a felony, pursuant to § 45-5-104, MCA (1995), and negligent endangerment, a misdemeanor, pursuant to § 45-5-208, MCA (1995). Schipman appeals from the Findings, Reasons, Judgment & Order Deferring Imposition of Sentence issued by the Fifth Judicial District Court, Beaverhead County. We reverse and vacate Schipman's conviction of negligent homicide.

¶2.The dispositive issue on appeal is whether the result of Schipman's conduct in leaving the scene after striking the horse was negligent homicide.

Factual and Procedural Background

¶3.At about 9:45 p.m. on July 21, 1995, Schipman left his two daughters with a babysitter at his trailer home near Dillon, Montana, and headed to a birthday party at the Glen Bar. Schipman first went to the Metlen Bar, arriving at approximately 10 p.m., where he consumed one beer. He then proceeded to the Glen Bar, arriving at about 10:45 p.m., only to find that the birthday party was over. Schipman nevertheless remained at the bar and played pool until about 12:30 p.m. While at the Glen Bar, Schipman stated that he thought he consumed about three more beers.

¶4.In the early morning hours of July 22, 1995, Andy Weakley (Weakley) was driving on Montana Highway 91 north of Dillon when he noticed that a horse was loose on the

highway. Although it was a dark and rainy evening and the horse was a dark color, Weakley was able to spot the horse running on the highway and stopped his vehicle. Weakley then attempted to catch the horse, but was unable to restrain the animal. Unable to capture the horse, Weakley immediately returned to Dillon and called 911 at 1:41 a.m. to report the horse running on the highway.

¶5.It was a very dark night, according to Schipman, when he left the Glen Bar. Schipman was nearly home from the bar when a dark horse lunged out of the ditch alongside the highway and struck his vehicle, causing extensive damage to the passenger side of Schipman's truck. The horse lunged so suddenly that Schipman had no time to react and, thus, did not attempt to swerve or brake to avoid hitting the horse. Schipman recounted that only the front torso of the horse was on the highway upon impact. After hitting the horse, however, Schipman did not stop his vehicle; looking back Schipman did not see the horse on the highway and, assuming that it was dead, proceeded home. Upon arriving home, Schipman's neighbor asked him what had happened to his truck. Schipman described the collision to his neighbor, stating that he had hit the horse so hard that the impact had knocked the horse into the borrow pit alongside the highway, and that he was sure the horse was not still on the highway.

¶6.Meanwhile, Weakley returned to the location where he had first seen the dark horse. He discovered the horse in approximately the same location as before, but the horse was lying motionless across the southbound lane of the highway. Upon inspecting, Weakley determined that the horse appeared to have a broken neck. Weakley thought the horse was dead. Thus, he parked his vehicle in the northbound lane of Montana Highway 91 some distance ahead of the horse, and turned on his flashers in an attempt to warn oncoming traffic of the road hazard. Shortly thereafter, a second vehicle driven by Larry Mallon (Mallon) pulled in behind Weakley's vehicle.

¶7.At about this same time, two recent high school graduates, Jamie Keller (Keller) and Tresa Dorvall (Dorvall), were returning home to Dillon after spending an evening with friends in Virginia City. Keller was driving Dorvall's older model Toyota pickup at a speed of about 55 miles per hour. Upon noticing two vehicles parked in the northbound lane of travel, Keller slowed down. However, Keller could not see any reason why the two vehicles were stopped. Dorvall, upon seeing two men standing by the side of the road, told Keller not to stop. Thus, Keller continued past the two men until Dorvall exclaimed, "There's something in the road." Keller then saw the horse but it was too late. She pulled the vehicle to the right because she thought that it would be better to go into the borrow pit

than to hit the horse. Keller could not avoid hitting the horse.

¶8. Upon impact, Keller initially lost consciousness. When she came to, she was still inside the vehicle and the vehicle was in the borrow pit. However, Dorvall was not in the vehicle. Dorvall had been thrown from the pickup and was lying off the road not far from the horse. Dorvall was having great difficulty breathing, and subsequently died from the injuries she sustained. Beaverhead County authorities responded to the accident, and the first officer on the scene reported that even with knowledge of the horse's location, it was very difficult to spot the dead horse on the highway.

¶9. Upon arriving home after the accident, Schipman called his girlfriend and told her that he had hit a horse but that he thought it went into the ditch alongside the highway. According to Schipman, he did not immediately report hitting the horse to the authorities because he had been drinking. It was not enough in my opinion to--I did not consider myself intoxicated, but I considered myself a likely candidate for a Breathalyzer that would maybe flunk. Drink two beers and you are legally intoxicated on the Breathalyzer. I did not want to risk my--I did not want to risk that.

¶10. The day following the accident, Schipman called authorities to report hitting the horse. When interviewed about the accident, Schipman told authorities that he did not call in the accident immediately after hitting the horse because he had been drinking and did not want to risk being charged with a DUI. When asked why he did not stay at the accident scene, Schipman responded, "No reason I guess."

## Discussion

¶11. The dispositive issue on appeal is whether the result of Schipman's conduct in leaving the scene after striking the horse was negligent homicide.

¶12. The parties agree on appeal that Schipman's conduct in leaving the scene of the accident without first stopping to determine whether the horse was blocking the roadway and whether there was a need to warn oncoming motorists of that road hazard is the alleged criminally negligent act underlying Schipman's convictions. Thus, the dispositive question becomes whether Schipman's decision to leave the scene of the accident was the cause in fact of Dorvall's death.

¶13. Schipman was convicted of negligent homicide, a felony, pursuant to § 45-5-104,

MCA (1995), which provides that "[a] person commits the offense of negligent homicide if he [or she] negligently causes the death of another human being." Section 45-5-104(1), MCA (1995). Schipman was also convicted of negligent endangerment, a misdemeanor, pursuant to § 45-5-208, MCA (1995), under which "[a] person who negligently engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of negligent endangerment." Section 45-5-208(1), MCA (1995). Therefore, as a material element of either offense, the State was required to prove beyond a reasonable doubt that Schipman's conduct was criminally negligent pursuant to the definition of § 45-2-101(42), MCA (1995).

¶14. The conduct alleged to be negligent was Schipman's decision to leave the scene of the collision without taking action to warn other motorists of the potential risk the horse posed. Schipman's collision with the horse occurred in an "open range" area on a stormy night. Numerous witnesses testified that the horse was dark in color, and that it was virtually impossible to perceive the horse on the road given that it was a dark and rainy night. Following the impact with the horse, as Schipman points out, he looked back to see if the horse was on the highway but he could not see it lying in the roadway. On several occasions following the collision, Schipman stated that he firmly believed that the horse was in the borrow pit alongside the highway. The serious body damage to the passenger-side of Schipman's truck supports Schipman's story. Following the accident, since Schipman's truck was leaking radiator fluid and Schipman had glass shards in his head, Schipman chose to drive one fourth of a mile to the driveway of his trailer court to attend to his personal problems. In sum, Schipman left the scene of the collision with the horse under a mistaken belief that the horse was dead and in the ditch alongside the highway.

¶15. Schipman contends that had he remained at the scene of the accident, the actual result would not have been any different. In so arguing, Schipman contends that there were "independent intervening events," namely, the young girls' decision to disregard the warnings of Weakley and Mallon, which should absolve him of criminal liability for the result of Dorvall's death. After Schipman departed from the scene of the accident, Weakley and then Mallon stopped near the dead horse and Weakley engaged the hazard lights of his vehicle. As Keller and Dorvall subsequently approached the scene of the accident, Weakley got out of his vehicle, and began waiving his arms and yelling, "Stop." When Keller did not appear to be slowing down, Weakley then flashed his headlights on and off. Keller recounted seeing the hazard lights and the two men on the roadside in the middle of the night. Upon seeing the two men, Keller and Dorvall made a conscious decision not to stop. Based on these facts, Schipman argues that the jury should not be

allowed to speculate as to whether Keller would have slowed down or stopped had there been three vehicles with their flashers on and three men along the roadside attempting to warn oncoming traffic of the horse in the road. Therefore, Schipman asserts that this Court should not permit the result, i.e., the death of Dorvall, to influence his criminal culpability. We agree.

¶16.In this case, cause in fact was not established. Even though Schipman did not stop at the scene of the accident, others did. Those who did made every reasonable effort to warn oncoming motorists that a hazard existed on the road. They parked their vehicles on the highway, left their headlights on, activated their emergency blinkers, and tried to warn oncoming motorists. Had Schipman stopped, he could not have done more. In spite of the efforts to warn motorists of the road hazard, the vehicle in which Dorvall was a passenger did not stop. The girls did not do so because they noticed two men alongside the road. There is no basis to speculate that they would have stopped or avoided the road hazard had they seen three men alongside the road.

¶17.Schipman claims in his reply brief on appeal that "[i]f this Court finds that his actions do not amount to criminal negligence, both the misdemeanor [negligent endangerment] and felony [negligent homicide] convictions must fall." We disagree. First, we note that Schipman's contentions in his principal brief on appeal appear to focus exclusively on the infirmity of his negligent homicide conviction; only in his reply brief does Schipman claim that the issues raised on appeal relate to both convictions. Second, in this decision, we have assumed, without deciding, that Schipman's actions were criminally negligent under the definition of § 45-2-101(42), MCA(1995).

¶18.We conclude that there is no evidence that Schipman's negligent act did, in fact, cause Dorvall's death. Therefore, the elements of negligent homicide have not been proven and Schipman's conviction for that offense must be reversed.

¶19.The conviction for negligent homicide is reversed and vacated.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

Justice Karla M. Gray, dissenting.

¶20.I dissent from the Court's opinion which appears to be based on a determination that Schipman's negligent conduct in failing to take any action to warn motorists of the dead horse in the road did not cause Dorvall's death as a matter of law. It is my view that the causation question in this case was a question of fact for the jury which was properly submitted to the jury and, applying the correct standard of review, we are obligated to affirm Schipman's conviction for negligent homicide.

¶21.Our standard in reviewing a jury verdict is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Medrano* (1997), 285 Mont. 69, 73, 945 P.2d 937, 939. In conducting such a review, we must keep in mind that witness credibility and the weight to be given testimony are to be determined by the trier of fact. *See State v. Ahmed* (1996), 278 Mont. 200, 212, 924 P.2d 679, 686. Without explanation, the Court does not cite or apply these standards. Moreover, it does not view the evidence in the light most favorable to the prosecution. Indeed, the Court relies almost totally on Schipman's version of the events and accepts his testimony at face value without any regard to the State's evidence and particularly without regard to inconsistencies and weaknesses in Schipman's version, such as the fact that he did not tell law enforcement officials until much later that he had looked back and seen nothing after hitting the horse. Nor does the Court discuss the conflicting evidence that Schipman hit the horse head-on, resulting in the horse immediately falling to the ground in the southbound lane and staying there to ultimately be hit by the vehicle Keller was driving.

¶22.Finally, the Court does not present clearly either the State's theory of the case or Schipman's somewhat conflicting defense theories. The State's theory was that the horse was in the road, not lunging toward it, when Schipman hit it broadside and left it lying in the southbound lane. Moreover, while the State agreed that Weakley and Mallon's actions in parking in the northbound lane and attempting to warn oncoming motorists about the horse in the southbound lane were not unreasonable, the State's evidence pointed to other actions Schipman could have taken which would have prevented the accident. For example, had Schipman actually checked on the horse's whereabouts and seen that it was

in the southbound lane, he could have remained at the scene and parked his vehicle with his headlights shining on the dead horse as a clear warning to other motorists on that dark night that the road was obstructed. Similarly, he could have placed his vehicle--much more visible than a dark, dead horse--in the southbound lane marking the spot so that oncoming southbound vehicles would have had to go around it. In addition, the record reflects that about 10 minutes elapsed between Schipman hitting the horse and the fatal accident. According to the timing-related evidence, Schipman could have driven to his home after hitting the horse in approximately 30 seconds, as he did, and called 911 instead of engaging friends in conversation for an extended period of time; had he done so, the evidence reflects that law enforcement officers could have responded to the dead horse in the roadway in 3 minutes and properly "secured" the area to warn oncoming motorists by placing flares and turning on the patrol car's revolving top lights.

¶23. The Court's failure to discuss Schipman's alternative defense theories, which likely undermined his credibility in the jury's eyes, also reflects the extent to which the Court has merely accepted Schipman's evidence and argument that cause in fact was not established as a matter of law. Schipman's primary theory--as related by the Court--was that he hit the horse as it was lunging near to, but not on, the roadway, looked back, saw nothing, assumed the horse was in the borrow pit and proceeded home. Under this theory, the horse subsequently returned to the roadway and died prior to the time Weakley arrived to find it in the southbound lane, and nothing Schipman could have done would have changed the result. This theory incorporated two of Schipman's defenses: that Weakley and Mallon's actions mitigated any culpability he might have had and that the Keller vehicle should have seen the dead horse in the road and stopped in time. Schipman's version of the accident itself, however, was challenged on cross-examination and through substantial evidence presented by the State. Furthermore, as pointed out above, the record reflects other ways in which Schipman could have given warning to prevent the fatal accident. Schipman also presented an "alibi" defense of sorts. Under this somewhat undeveloped theory, he apparently either hit a different horse or hit the horse at issue earlier, leaving it alive, and was already home by the time Weakley first saw the horse running loose on the highway.

¶24. The State charged Schipman with negligent homicide in that he negligently caused Dorvall's death. *See* § 45-5-104, MCA (1995). The allegedly negligent conduct at issue was Schipman's decision to leave the scene and do nothing to warn other motorists of the risk the horse posed after he hit it. Although it is somewhat difficult to tell from its opinion, the Court appears to assume *arguendo* that Schipman's conduct was, in fact,

criminally negligent in that Schipman consciously disregarded the risk that a death would result from his leaving a dead horse on the road without taking any steps to warn other motorists. *See* § 45-2-101(42), MCA (1995). Thus, under the Court's reasoning, only the causation element remained to be established.

¶25.In a negligent homicide case, the State must prove that the accused's conduct is the "cause-in-fact" of the victim's death. *See State ex rel. Kuntz v. Thirteenth Judicial Dist. Court*, 2000 MT 22, ¶¶ 36-37, ___ P.2d ___, ¶¶ 36-37, 57 St.Rep. 111, ¶¶ 36-37. "A party's conduct is a cause-in-fact of an event if 'the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' " *Kuntz*, ¶ 37 (citations omitted). Combining that definition with our standard of review of a jury verdict, the question before us, properly stated, is this: Whether, viewed in the light most favorable to the prosecution, there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that, but for Schipman leaving the scene of the horse accident and failing to take any action to warn of the risk he had created, Dorvall would not have died. Viewing the evidence of record in the light most favorable to the prosecution, I would conclude there was sufficient evidence for a jury to find causation in this case. I simply cannot agree with the Court's implicit determination that the fatal accident was unavoidable as a matter of law once Schipman hit the horse.

¶26.In closing, it is appropriate to observe that this was not a particularly strong case for the prosecution. Had the case against Schipman been either stronger or weaker, a plea agreement might have been reached. That did not occur, however, and the case proceeded to a jury. In my view, this is the kind of close case in which a decision by the jury was entirely appropriate. While the jury might well have acquitted Schipman of negligent homicide on the evidence before it, and while some might think that was a more appropriate outcome, I submit the jury was well within its province in convicting Schipman. In my view, it is unwise for this Court to start down the road of deciding close factual questions in criminal cases as a matter of law, especially when it accomplishes such a resolution by merely accepting the defendant's version of the facts and arguments. I dissent.

/S/ KARLA M. GRAY

Chief Justice J. A. Turnage joins in the foregoing and following dissenting opinions of Justice Gray and Justice Leaphart.

/S/ J. A. TURNAGE

Justice W. William Leaphart, dissenting.

¶27. I join in Justice Gray's dissenting opinion and note with curiosity that the Court twice mentions that, after hitting a dark horse on a very dark night, Schipman looked back in his rear view mirror and when he did not see the dark horse on the dark road, assumed it was in the ditch. The Court concludes that Schipman left the scene "under a mistaken belief that the horse was dead and in the ditch alongside the highway." Given that no one (even without the benefit of four beers) would be able to see a dark horse on a dark night in a rear view mirror any more than they could look in a rear view mirror and see a white horse lying on a snow-packed highway in a blizzard, I fail to see how this meaningless glance in the mirror justified Schipman's "mistaken belief" that the horse was not on the highway.

/S/ W. WILLIAM LEAPHART